IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 (Subchapter V) |
| PIONEER HEALTH SYSTEMS LLC, *et al.*,[1] | ) ) ) | Case No. 24-10279 (JKS) |
| Debtors. | ) ) | (Jointly Administered) |
| | ) ) | **Docket Ref. No. 185** |

**OBJECTION OF NORTH POINTE VENTURES, LLC TO THE DEBTORS'
AMENDED SUBCHAPTER V PLAN OF REORGANIZATION**

North Pointe Ventures, LLC ("**North Pointe**"), a creditor and party in interest in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), by and through its undersigned counsel, hereby files this objection (this "**Objection**") to the *Amended Subchapter V Plan of Reorganization* [Docket No. 185] (as amended, modified or supplemented from time to time, the "**Proposed Plan**") filed by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**")[2] and respectfully states as follows:

**OBJECTION**

1. Through the Proposed Plan, the Debtors—a sophisticated orthopedic urgent care company with hundreds of employees and ten clinic locations—seek to abuse the provisions of Subchapter V to orchestrate an insider deal that provides for the retention of equity by the current owners, the re-payment of the insider DIP Loan on the Effective Date, and the payment of hefty post-Effective Date salaries to insiders, all while holders of Allowed General Unsecured

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows: Pioneer Health Systems LLC (4107), DOC LLC (0729), DOCTX3 PLLC (2604), PAS Services PLLC (8928), and DOC Corporate Group LLC (0970). The address of the Debtors' corporate headquarters is 3300 Dallas Pkwy, Suite 200, Plano, TX 75093.

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Proposed Plan.

31793505.3

Claims are left with a speculative recovery years in the future, despite the Debtors' receipt of a significantly better cash offer from North Pointe.

2. As disclosed in the Debtors' Plan Supplement, North Pointe offered "to purchase the Debtors' equity for approximately $12.235 million in cash. If the transaction is consummated, the cash consideration will be used to retire the DIP Loan, Administrative Expenses, and Convenience Class Claims; fund a $1 million operating reserve to fund the Debtors' working capital needs, and distribute $250,000 to Pioneer's equity holders. The remaining cash, estimated at $10.25 million, would be distributed to Claimants holding General Unsecured Claims on a pro rata basis in full satisfaction of their Claims." *Plan Supplement* [Docket No. 215], Exh. 1.

3. North Pointe has since improved its offer for general unsecured creditors, in response to comments from the Office of the United States Trustee for the District of Delaware. As a result, the $250,000 previously allocated for equity holders will be distributed to holders of Allowed General Unsecured Claims, increasing their allocation from $10,250,000 in cash to $10,500,000 in cash, inclusive of funding for a trust to administer such claims.

4. North Pointe's offer, if accepted by the Debtors, would provide cash funding for the payments contemplated by the Proposed Plan and increase recoveries for holders of Allowed General Unsecured Claims from (i) the Debtors' offer of $7,024,148 in projected future income plus the net recoveries of any Avoidance Actions to (ii) $10,500,000 in cash plus the net recoveries of any Avoidance Actions, including funding for a trust to administer General Unsecured Claims. Under North Pointe's proposal, the projected recovery for holders of General Unsecured Claims would increase from approximately 33% to approximately 50%. Moreover, because North Pointe's offer is in cash, and does not rely on projected future income, holders of Allowed General Unsecured Claims would receive their distributions as soon as all Class 4 claims

are reconciled and allowed, as opposed to waiting until February 2026 to 2030 under the Proposed Plan.[3]

        5.      The Debtors' failure to more thoroughly explore North Pointe's offer, and other potential offers, in chapter 11 and to thereby potentially provide guaranteed recoveries to their creditors reflects a lack of good faith in their proposal of the Proposed Plan. Section 1129(a)(3) of the Bankruptcy Code provides that a court shall ***only*** confirm a plan if "[t]he plan has been proposed in good faith and not be any means forbidden by law." 11 U.S.C. § 1129(a)(3). To determine whether a plan has been proposed in good faith, courts in the Third Circuit analyze "the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (quotations and citations omitted). The two recognized objectives and purposes of the Bankruptcy Code are "preserving going concerns and maximizing property available to satisfy creditors." *Id.* (quotations and citations omitted). In evaluating good faith, courts may also consider other bankruptcy policies, including, among other things, "the expeditious liquidation and distribution of the bankruptcy estate to its creditors" and "achieving fundamental fairness and justice." *Id.* at 157 (quotations and citations omitted). The good faith requirement "serves as a final check, or a 'catch-all' to prevent misuse of the bankruptcy system." *In re Walker*, No. BR 20-13557 ELF, 2021 WL 1732592, at *16-17 (Bankr. E.D. Pa. Apr. 30, 2021). These policies apply equally in Subchapter V cases. *See id.* (applying the good faith standard to a proposed Subchapter V plan).

---

[3] Such reconciliation should be expedient, given the relatively small number of filed proof of claims and that Exhibit A to the Proposed Plan identifies 18 claims that the Debtors believe would be subject to an objection.

31793505.3

6. The Debtors' proposal to implement a post-confirmation marketing and sale process, likely spurred on by North Pointe's post-petition offer, does not remedy the fact that the Proposed Plan does not maximize value for the Debtors' estates and therefore does not satisfy the "good faith" requirement of section 1129 of the Bankruptcy Code and may not be confirmed. First, North Pointe's offer is contingent on purchasing the Debtors' equity on the Effective Date of the Proposed Plan, not pursuant to an ill-defined, ***potential*** post-Effective Date sale process. Second, the prospect for this sale process, which is only speculative at this point, will not allow the Debtors to capture the value available to their creditors now—or possibly ever. At this time, North Pointe does not intend to participate in a sale process that is not supervised by the Court.

7. As described above, the Debtors have a cash offer in hand that would result in millions of dollars of additional recovery for general unsecured creditors and fund the distributions under the current Proposed Plan. North Pointe's offer would also facilitate expeditious distributions to creditors who will not have to wait two to six years for a recovery from projected future income that may never be produced. In reality, general unsecured creditors could receive nothing under the Proposed Plan. North Pointe's offer provides a guaranteed cash recovery for those same creditors.

8. North Pointe's offer also provides guaranteed cash funding for the Reorganized Debtors' business operations, whereas the Debtors have yet to demonstrate that they have the necessary exit financing to implement the Proposed Plan.[4] As such, the Proposed Plan may not even be feasible. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) ("The purpose of the feasibility test is to protect against visionary or speculative plans."); *In re Made in Detroit, Inc.*, 299 B.R. 170, 177 (Bankr. E.D. Mich. 2003), *aff'd*, 414 F.3d 576 (6th

---

[4] The Plan Supplement includes a term sheet for exit financing that expired on June 25, 2024. *See* Docket No. 215.

Cir. 2005) (holding that a debtor's plan was "not sufficiently concrete as to be feasible" because it was contingent on exit financing and there was "no reasonable assurance" that the loan would ever close).

9. Alternatively, if the Chapter 11 Cases were converted to chapter 7, North Pointe is still willing to work with a chapter 7 trustee to provide funding to maintain the Debtors' operations and to acquire substantially all of the Debtors' assets for $10 million. This offer would result in a projected recovery of approximately 38% for holders of Allowed General Unsecured Claims in chapter 7, which is also a better result than the Debtors' Proposed Plan.[5] Accordingly, the Proposed Plan also fails the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7) (requiring that, "[w]ith respect to each impaired class of claims or interests . . . each holder of a claim or interest of such class (i) has accepted the plan or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]"); *In re Stone & Webster, Inc.*, 286 B.R. 532, 544 (Bankr. D. Del. 2002) (noting that the best interests test set forth in section 1129(a)(7) is "an individual guaranty to each creditor or interest holder that it will receive at least as much in *reorganization* as it would in *liquidation*") (quotations and citation omitted) (emphasis in original).

10. Because the Proposed Plan fails to satisfy the requirements of sections 1129(a)(3) and 1129(a)(7) of the Bankruptcy Code, confirmation must be denied. The Court

---

[5] Taking the assumptions in the Debtors' liquidation analysis at face value, which estimate chapter 7 costs totaling $1,744,566.79 for payments to secured creditors, the chapter 7 trustee, and for chapter 11 administrative expenses, North Pointe's chapter 7 offer provides $8,255,433.21 for distributions to unsecured creditors, resulting in a recovery of 38.4%, which is nearly 5% higher than the estimated recovery for such creditors under the Debtors' Proposed Plan.

31793505.3

should not condone the Debtors' misuse of Subchapter V to retain equity at the direct expense of general unsecured creditors, particularly given that the Debtors are a large and sophisticated business with over $23 million in secured and unsecured debt and were arguably never intended to benefit from Subchapter V in the first place.[6]  Accordingly, the Court should deny confirmation of the Proposed Plan.

| | |
|---|---|
| Date:  June 28, 2024<br>Wilmington, Delaware | **YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP**<br><br>*/s/ Joseph M. Mulvihill*<br>Joseph M. Mulvihill (No. 6061)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone:  (302) 571-6600<br>Email: jmulvihill@ycst.com<br><br>*Counsel for North Pointe Ventures, LLC* |

---

[6] It is unclear whether the Debtors even qualify for relief under Subchapter V.  The *Declaration of Colin Chenault in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 17] (the "**Declaration**") states that "[n]et of intercompany obligations, the combined total of the secured debt and unsecured debt of the Debtors is approximately $12,035,941.98. Of that amount, $9,755,972.00 is debt owed to various insiders."  However, the Proposed Plan estimates Class 1 Secured Claims in the amount of $1,710,607.04, Class 2 Priority Wage Claims in the amount of $35,300.00, Class 3 1122(b) Convenience Claims in the amount of $39,282.99, and Class 4 General Unsecured Claims in the aggregate amount of $21,472,802.87, resulting in total secured and unsecured debt of $23,257,992.90.  Proposed Plan at 17.  If the insider debt identified in the Declaration is subtracted from this total, the Debtors have a total of $13,502,020.90 in non-insider debt, which is well in excess of the cap under Subchapter V of the Bankruptcy Code.  *See* 11 U.S.C. § 1182 (defining the cap under Subchapter V as "aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $7,500,000 (excluding debts owed to 1 or more affiliates or insiders) not less than 50 percent of which arose from the commercial or business activities of the debtor[.]").  Intercompany claims do not appear to have been included in the above amounts, because the list of Unsecured Claims Asserted or Scheduled attached to the Proposed Plan totals $21,472,802.87 and does not include claims held by any Debtors.  This further undermines the good faith of the Debtors in prosecuting their chapter 11 cases entirely.