## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 24-10279 (JKS) |
| PIONEER HEALTH SYSTEMS LLC, *et al.*,[1] | Chapter 11 (Subchapter V) |
| Debtors. | (Jointly Administered) |
| | **Related Docket No.  230** |

## BRIEF IN SUPPORT OF CONFIRMATION OF DEBTORS'
## SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows: Pioneer Health Systems LLC (4107), DOC LLC (0729), DOCTX3 PLLC (2604), PAS Services PLLC (8928), and DOC Corporate Group LLC (0970). The address of the Debtors' corporate headquarters is 3300 Dallas Pkwy, Suite 200, Plano, TX 75093.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ v

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND .............................................................................................. 5

I.      Procedural History ................................................................................ 5

II.     The Plan Solicitation and Notification Process ................................. 9

ARGUMENT ................................................................................................... 11

I.      The Plan Satisfies the Disclosure Requirements of 11 U.S.C. § 1190 ........................... 11

II.     The Plan Satisfies the Confirmation Requirements of a Consensual Plan Under 11 U.S.C. § 1191(a) ........................................................................................... 13

III.    The Plan Satisfies the Applicable Provisions of 11 U.S.C. § 1129(a) ........................ 13

   A.   The Plan Complies with Section 1129(a)(1) ................................................... 13

      1.   The Plan Complies with the Requirements of Section 1122 ................................. 14

      2.   The Plan Satisfies the Mandatory Requirements of Section 1123(a) ....................... 15

         a.   Section 1123(a)(1) ................................................................................. 15

         b.   Section 1123(a)(2) ................................................................................. 16

         c.   Section 1123(a)(3) ................................................................................. 16

         d.   Section 1123(a)(4) ................................................................................. 16

         e.   Section 1123(a)(5) ................................................................................. 16

         f.   Section 1123(a)(6) ................................................................................. 17

         g.   Section 1123(a)(7) ................................................................................. 17

         h.   Section 1123(a)(8) ................................................................................. 18

      3.   The Release Provision and the Exculpation Provision Under the Plan Are Consistent with Section 1123(b) ........................... 18

         a.   The Debtor Releases Are Appropriate and Should be Approved .................. 18

         b.   The Exculpation Provision Should be Approved ............................... 20

ii

**B.** **The Plan Complies with Section 1129(a)(2)** ............................................. 22

**C.** **The Plan Complies with Section 1129(a)(3)** ............................................. 22

**D.** **The Plan Complies with Section 1129(a)(4)** ............................................. 24

**E.** **The Plan Complies with Section 1129(a)(5)** ............................................. 24

**F.** **The Plan Complies with Section 1129(a)(6)** ............................................. 25

**G.** **The Plan Complies with Section 1129(a)(7)** ............................................. 25

**H.** **The Plan Complies with Section 1129(a)(8)** ............................................. 26

**I.** **The Plan Complies with Section 1129(a)(9)** ............................................. 26

**J.** **The Plan Complies with Section 1129(a)(10)** ........................................... 27

**K.** **The Plan Complies with Section 1129(a)(11)** ........................................... 28

**L.** **Section 1129(a)(12) is Inapplicable** ........................................................... 29

**M.** **Section 1129(a)(13) is Inapplicable** ........................................................... 29

**N.** **Section 1129(a)(14) is Inapplicable** ........................................................... 30

**O.** **Section 1129(a)(15) is Inapplicable** ........................................................... 30

**P.** **Section 1129(a)(16) is Inapplicable** ........................................................... 30

**IV.** **Modifications to the Plan Supplement Do Not Require Resolicitation** ..................... 30

**V.** **The Unresolved Objections to Confirmation of the Plan Should be Overruled** .......... 33

**A.** **Objection of Medport Billing, LLC and MSC Holdings, LLC d/b/a SyndeoCare to Amended Subchapter V Plan of Reorganization [Docket No. 218]** .................... 33

   **1.** **Retention of Equity Interests** ................................................................ 34

   **2.** **The Debtors Are Not Required to Separately Classify Various Types of General Unsecured Claims** ................................................................................. 35

   **3.** **The Plan's Treatment of Dr. Hassinger's Secured and Unsecured Claims, Dr. Hassinger's Status as a Consultation Party, and Disclosure of His Compensation for Service as Chief Executive Officer Do Not Render the Plan Unconfirmable** ............... 37

   **4.** **The Entire Fairness Standard is Inapplicable to the Plan** .................................... 38

**5.     MSC's Attempt to Impose Equitable Subordination and Recharacterization to All Insider Claims Through an Objection Should Be Rejected** ..................................... 41

    **a.     Equitable Subordination** ........................................................................ 41

    **b.     Recharacterization** ................................................................................ 43

**6.     Oversight Process for Analysis of Insider Claims** .................................. 44

**B.     Objection of North Pointe Ventures, LLC to the Debtors' Amended Subchapter V Plan of Reorganization [Docket No. 219]** .................................................................. 44

**1.     The Debtors Are Not Bound to Conduct a Sale Process During the Bankruptcy Cases** ................................................................................................................................ 45

**2.     North Pointe's Misleading Chapter 7 Musings** ...................................... 47

**3.     North Pointe's Efforts to Undermine the Debtors' Exclusive Right to Propose a Plan** ............................................................................................................................... 48

**C.     MSC and North Pointe Are Time Barred from Objecting to the Debtors' Subchapter V Elections** .................................................................................................. 49

**D.     Limited Objection and Reservation of Rights to the Amended Subchapter V Plan of Reorganization of Paul C. Dougherty and PCD Building Company [Docket No. 217]** ... 50

**VI.     Cause Exists to Waive the Stay of the Confirmation Order** ....................................... 52

**CONCLUSION** ................................................................................................ 53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 266 Washington Assocs.*,
 141 B.R. 275 (Bankr. E.D.N.Y.) .................................................................14, 15, 36

*In re ACG Holdings*,
 No. 08-11467 (CSS) (Bankr. D. Del. Aug. 6, 2008) ...............................................22

*In re Autostyle Plastics, Inc.*,
 269 F.3d 726 (6th Cir. 2001) ...............................................................................42, 43

*In re Bally Total Fitness*,
 2007 WL 2779438 (Bankr. S.D.N.Y Sept. 7, 2007) ...............................................22

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
 526 U.S. 434 (1999) ................................................................................................25

*In re Burns & Roe Enters., Inc.*,
 No. 08-4191 (GEB), 2009 WL 438694 (D.N.J. Feb. 23, 2009) ..............................32

*In re Burns & Roe Enters.*,
 No. 08-4191 (GEB), 2009 U.S. Dist. LEXIS 13574 (D.N.J. Feb. 20, 2009) ..........23

*Cantwell-Cleary Co. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*,
 36 F.4th 509 (4th Cir. 2022) ..................................................................................34

*In re Chip's Southington, LLC*,
 No. 20-21458 (JJT), 2021 Bankr. LEXIS 3133 (Bankr. D. Conn. Nov. 13,
 2021) ........................................................................................................................35

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
 432 F.3d 448 (3d. Cir. 2006) ..................................................................................43

*In re Combustion Eng'g, Inc.*,
 391 F.3d 190 (3rd Cir. 2004) ..................................................................................22

*In re Consol. Land Hldgs., LLC*,
 No. 6:19-bk-04760-KSJ, 2021 Bankr. LEXIS 2270 (Bankr. M.D. Fla. Aug.
 20, 2021) ..................................................................................................................36

*In re Coram Healthcare Corp.*,
 315 B.R. 321 (Bankr. D. Del. 2004) .......................................................................18

*Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Hldg. Corp. (In re Montgomery Ward Hldg. Corp.)*,
   242 B.R. 147 (D. Del. 1999) .......................................................................................45, 46

*In re DJK Residential LLC*,
   No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008) ......................................................22

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 (2nd Cir. 1992) ...............................................................................20

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...................................................................14

*In re Elsinore Shore Assocs.*,
   91 B.R. 238 (Bankr. D.N.J. 1988) .........................................................................24

*In re Enron Corp.*,
   326 B.R. 497 (S.D.N.Y. 2005) ...............................................................................20

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) ......................................................................18

*Frito-Lays Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*,
   10 F.3d 944 (2nd Cir. 1993) .................................................................................14

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988) ...................................................................24

*In re Glob. Safety Textiles Holdings LLC*,
   No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) .............32

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
   994 F.2d 1160 (5th Cir. 1993) ..............................................................................28

*IRS v. Kaplan (In re Kaplan)*,
   104 F.3d 589 (3rd Cir. 1997) ................................................................................28

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) .....................................................................14

*In re Johns-Manville Corp.*,
   843 F.2d 636 (2nd Cir. 1988) ...........................................................................14, 23

*Kahn v. Lynch Commc'n Sys., Inc.*,
   638 A.2d 1110 (Del. 1994) ...................................................................................39

vi

*In re Landing Assoc., Ltd.*,
   157 B.R. 791 (Bankr. W.D. Tex. 1993) ...................................................................28

*In re LightSquared Inc.*,
   513 B.R. 56 (Bankr. S.D.N.Y. 2014) ....................................................................36

*In re Lionel Corp.*,
   722 F.2d 1063 (2d Cir. 1983)................................................................................46

*In re Madison Hotel Associates*,
   749 F.2d 410 (7th Cir. 1984) ................................................................................23

*In re Mallinckrodt PLC*,
   639 B.R. 837 (Bankr. D. Del. 2022) .....................................................................36

*Nat'l Union Fire Ins. v. BSA (In re BSA)*,
   650 B.R. 87 (D. Del. 2023) ..................................................................................32

*In re Nite Lite Inns*,
   17 B.R. 367 (Bankr. S.D. Cal. 1982) ...................................................................23

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) .....................................................................14

*Official Comm. of Unsec. Creditors of HH Liquid., LLC v. Comvest Grp. Hldgs.,
   LLC (In re HH Liquid., LLC)*,
   590 B.R. 211 (Bankr. D. Del. 2018) ...............................................................41, 42

*In re PWS Holding Corp.*,
   228 F.3d 224 (3rd Cir. 2000) .....................................................................20, 21, 22

*In re Resort Int'l, Inc.*,
   145 B.R. 412 (Bankr. D.N.J. 1990) ......................................................................24

*In re Sea Containers Ltd.*,
   No. 06-11156 (KJC) (Bankr. D. Del. Nov. 24, 2008).............................................21

*In re Sea Garden Motel and Apartments*,
   195 B.R. 294 (Bankr. D. N.J. 1996) .....................................................................28

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
   530 F.3d 230 (3d Cir. 2008)..................................................................................41

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) .....................................................................19

*In re Sun Country Dev., Inc.*,
   764 F.2d 406 (5th Cir. 1985) ................................................................................23

*In re Tesla Motors, Inc. S'holder Litig.*,
    2018 Del. Ch. LEXIS 102, 2018 WL 1560293 (Del. Ch. Mar. 28, 2018).......................39, 40

*In re Texaco Inc.*,
    84 B.R. 893 (Bankr. S.D.N.Y. 1988) ....................................................................................22

*In re Toy & Sports Warehouse, Inc.*,
    37 B.R. 141 (Bankr. S.D.N.Y. 1984) ....................................................................................14

*Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*,
    917 F.2d 1210 (9th Cir. 1989) ..............................................................................................23

*U.S. v. Energy Res. Co.*,
    495 U.S. 545 (1990)...............................................................................................................28

*United States v. Reorganized CF&I Fabricators, Inc.*,
    518 U.S. 213 (1996)...............................................................................................................25

*In re VER Technologies HoldCo, LLC*,
    No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018) .............................................................21

*In re W.A. Mallory Co.*,
    214 B.R. 834 (Bankr. E.D. Va. 1997)...................................................................................45

*In re Wash. Mut. Inc.*,
    442 B.R. at 350 .....................................................................................................................21

*In re Washington Assocs.*,
    147 B.R. 827 (E.D.N.Y. 1992) ....................................................................................14, 15, 36

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) .....................................................................................19

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ..............................................................................38, 39, 40

**Statutes**

11 U.S.C. § 105...........................................................................................................................1

11 U.S.C. § 341.........................................................................................................................49

11 U.S.C. § 361...........................................................................................................................1

11 U.S.C. § 362...........................................................................................................................1

11 U.S.C. § 363......................................................................................................................1, 45

11 U.S.C. § 364 ..........................................................................................................1

11 U.S.C. § 503 ..........................................................................................................1

11 U.S.C. § 506 ........................................................................................................51

11 U.S.C. § 507 .........................................................................................1,15, 26, 27

11 U.S.C. § 1114 ......................................................................................................29

11 U.S.C. § 1122 ..................................................................13, 14, 15, 31, 35

11 U.S.C. § 1123 .........................................13, 14,15, 16, 17, 18, 19, 31

11 U.S.C. § 1126 ................................................................................................9, 26

11 U.S.C. § 1127 ......................................................................................................31

11 U.S.C. § 1129 ................................................................................................ *passim*

11 U.S.C. § 1141 ......................................................................................................13

11 U.S.C. § 1181 ................................................................................................30, 13

11 U.S.C. § 1182 ........................................................................................................5

11 U.S.C. § 1183 ......................................................................................................13

11 U.S.C. § 1190 ................................................................................................11, 12

11 U.S.C. § 1191 .........................................................1, 5, 13, 30, 34, 35, 37

11 U.S.C. § 1192 ......................................................................................................13

28 U.S.C. § 1930 ......................................................................................................29

Small Business Reorganization Act of 2019 (Public Law 116-54) .................................5

**Rules**

Fed. R. Bankr. P. 1020(b) ........................................................................................49

Fed. R. Bankr. P. 1020(c) ........................................................................................50

Fed. R. Bankr. P. 3019 ............................................................................................31

Fed. R. Bankr. P. 3020 ............................................................................................51

Fed. R. Bankr. P. 7001 ........................................................................................................41

Fed. R. Bankr. P. 9014 ........................................................................................................50

Fed. R. Bankr. P. 9019 ........................................................................................................18

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ...............................................................................................14

S. Rep. No. 95-989 (1978) ...................................................................................................14

The above-captioned debtors and debtors in possession, Pioneer Health Systems LLC, DOC LLC, DOC Corporate Group LLC, DOCTX3 PLLC, and PAS Services PLLC (collectively, the "Debtors"), hereby submit this memorandum of law (the "Confirmation Brief") filed in support of confirmation of the Debtors' *Second Amended Subchapter V Plan of Reorganization* [Docket No 230] (as may be further modified, amended or supplemented from time to time, the "Plan"),[2] filed on July 5, 2024, pursuant to section 1191 of title 11 of the United States Code ("Bankruptcy Code") and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      On February 21, 2024 (the "Petition Date"), the Debtors commenced these cases (the "Bankruptcy Cases") with the intention of confirming a plan of reorganization.

2.      Shortly after the Petition Date, the Debtors took numerous steps to implement their restructuring. The Debtors filed various motions seeking first-day relief, as more particularly described in Section 1.9 of the Plan, including a the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") [Docket No. 18] to provide necessary short-term liquidity for the Debtors' operations. The Court entered an order approving the relief requested in the DIP Motion on March 28, 2024 (the "Final DIP Order") [Docket No. 100].

3.      Thereafter, the Debtors filed their *Motion of Debtors for Entry of an Order Authorizing (I) Rejection of Certain Unexpired Leases of Nonresidential Real Property and (II)*

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

4890-1912-1362\9

*Abandonment of Any Remaining Property Located at Leased Premises* (the "<u>Lease Rejection Motion</u>") [Docket No. 62] to reject various leases for real property that were burdensome to their estates. On March 28, 2024, the Court entered an order granting the Lease Rejection Motion and approved rejection of the leases mentioned therein effective as of the Petition Date (the "<u>Lease Rejection Order</u>") [Docket No. 101].

4.     The Debtors also filed their *Motion of Debtors for Entry of an Order Authorizing Assumption of Certain Unexpired Lease of Nonresidential Real Property* (the "<u>Lease Assumption Motion</u>") [Docket No. 89] which sought assumption of those leases related to the locations which the Debtors intended to continue using for their operations. The Court approved the Lease Assumption Motion by order entered on April 16, 2024 (the "<u>Lease Assumption Order</u>") [Docket No. 140].

5.     Having rightsized their lease obligations and operations, the Debtors passed the first goalpost in their reorganization.

6.     On May 21, 2024, the Debtors proposed their *Subchapter V Plan of Reorganization* (as it may be amended or supplemented, the "<u>First Plan</u>") [Docket No. 181] which they amended on May 31, 2024, to address various comments they received. The Debtors *Amended Subchapter V Plan of Reorganization* (the "<u>First Amended Plan</u>") [Docket No. 185] was distributed to creditors for solicitation.

7.     After filing of the First Plan, the Debtors received expressions of interest in purchasing the Debtors or their assets from two parties, including North Pointe Ventures, LLC. Given the expressions of interests, the Debtors began working on a marketing process to market test the value of their business, but keeping in mind the Debtors' need to emerge with a confirmed

plan by August 2024 to be able to access exit financing for the additional liquidity needed for their operations to continue.

8.    The Debtors received informal comments from various creditors regarding their Plan and agreed to include language in the confirmation order to resolve these informal comments. The Debtors received four formal objections to confirmation of their Plan:

   a.   The *Limited Objection and Reservation of Rights* by Paul C. Dougherty and PCD Building Company [Docket No. 217]. The Debtors have objected to the claims filed by Paul C. Dougherty and PCD Building Company and the parties have agreed to resolve the objection to these claims following confirmation of the Plan.

   b.   The *Objection of Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare to Amended Subchapter V Plan of Reorganization* by Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare (collectively, "MSC") [Docket No. 218]. The Debtors have been conferring with MSC regarding the consensual resolution of their objection, but have not been able to resolve the objection.

   c.   The *Objection to the Debtors' Amended Subchapter V Plan of Reorganization* by North Pointe Ventures, LLC ("North Pointe") [Docket No. 219], which purchased a claim in these cases to become a party in interest. The Debtors have been conferring with North Pointe regarding the consensual resolution of their objection, but have not been able to resolve the objection.

   d.   The *Objection to Confirmation of Plan* filed by Collin County Tax Assessor/Collector [Docket No. 220]. The Debtors and the Collin County Tax

3

Assessor/Collector reached a consensual resolution of the objection, which the Debtors will include in the order confirming the Plan.

9.      Ultimately, after consultation with the U.S. Trustee and the Subchapter V Trustee,[3] the Debtors filed their *Second Amended Subchapter V Plan of Reorganization* (the "Second Amended Plan") [Docket No. 230] on July 5, 2024. The Second Amended Plan included a new **Exhibit I**, setting forth proposed sale procedures (first disclosed in the *Plan Supplement* [Docket No. 215]) for a post-confirmation sale process. The Debtors agreed to requests by the U.S. Trustee and the Subchapter V Trustee to provide creditors who voted on the plan an opportunity to change their votes on confirmation, and to allow all creditors to object to the revisions made by the Second Amended Plan.

10.      Notice of the filing of the Second Amended Plan, of the filing of a redline version of the Second Amended Plan, of the deadline for parties who voted to change their votes, and of the deadline to object to the revisions made by the Second Amended Plan was served upon all creditors as evidenced by the *Certificate of Service* filed on July 8, 2024 [Docket No. 235]. No additional objections were filed. One creditor contacted the Debtors' Voting Agent to change its acceptance of the Plan to a rejection, and that vote change is reflected in the ballot tabulation reproduced *infra* and attached to the declaration of the Voting Agent. *See Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding Solicitation and Tabulation of Ballots Cast on the Second Amended Subchapter V Plan of Reorganization* [Docket No. 253] (the "Voting Declaration"). As reflected by the Voting Declaration, all classes of impaired claims accepted the Plan.

---

[3] As defined in paragraph 15 of this Confirmation Brief.

11.     The Debtors have had continuing conversations with MSC and North Pointe regarding their objections to confirmation of the Second Amended Plan but have not yet been able to resolve those objections consensually.

12.     The Debtors have worked productively throughout this proceeding with the U.S. Trustee, the Subchapter V Trustee, and its significant creditors. Despite obtaining the necessary votes to obtain consensual confirmation under section 1191(a) of the Bankruptcy Code, there are unresolved objections to confirmation of the Plan. The Debtors are nevertheless seeking consensual confirmation of the Plan under section 1191(a) of the Bankruptcy Code.

13.     Confirmation of the Plan represents the best avenue for the Debtors to maximize the value of their business. Because the Plan satisfies the legal requirements for confirmation, the Debtors respectfully submit that the Plan should be confirmed.

## BACKGROUND

14.     On the Petition Date, each Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code as a debtor defined in Bankruptcy Code section 1182(1) and each Debtor elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code pursuant to the Small Business Reorganization Act of 2019 (Public Law 116-54), as amended.

15.     On February 22, 2024, Mr. David M. Klauder was appointed as the Subchapter V Trustee (the "Subchapter V Trustee"). No other trustee, examiner, or official committee has been appointed in these Bankruptcy Cases. The Debtors are operating their business as debtors in possession pursuant to section 1182(2) of the Bankruptcy Code.

### I.     Procedural History

16.     On May 21, 2024, the Debtors filed the Plan. This initial version contemplated paying the DIP Loan, paying other secured claims in the ordinary course, paying various Administrative Claims in full (on the Effective Date or over time), paying holders of unsecured

5

claims of not more than $1,600 on the Effective Date (for a total estimated distribution of less than $40,000), and paying Allowed General Unsecured Claims a total of $7,224,148 on a *pro rata* basis.

17.     On May 30, 2024, the Debtors filed the First Amended Plan. That version added a class for allowed priority wage claims, which are to be paid in full on the Effective Date, added provisions respecting small distributions and distributions to creditors holding multiple claims against multiple debtors on the same theory of liability, and made various typographical corrections.

18.     On May 31, 2024, the Court entered the *Order (I) Scheduling the Confirmation Hearing; (II) Establishing the Plan Objection and Voting Deadlines; (III) Approving the Form and Manner of Notice of the Confirmation Hearing and Related Documents; and (IV) Granting Related Relief* [Docket No. 188] (the "Solicitation Order"), which, among other things, set the hearing to consider the confirmation of the Plan ("Confirmation Hearing").

19.     The Debtors' counsel caused solicitation materials, notice of the deadline for objecting to confirmation of the Plan, and related notices, forms, and Ballots to be distributed on May 31, 2024, and continuing thereafter (the "Solicitation Packages"), as evidenced by, among other things, the *Certificate of Mailing of Emily Young* [Docket No. 201].

20.     On June 22, 2024, the Debtors filed the Plan Supplement [Docket No. 215] (the "Plan Supplement"), which contained proposed revisions to Sections 2.5 and 9.29 concerning a proposed sale trigger, a new Section 6.13 concerning the retentions of causes of action, a revised form of **Exhibit F**, and term sheets for the proposed Exit Facility. A copy of the Plan Supplement together with a notice concerning the Plan Supplement, were distributed on June 24, 2024, as evidenced by, among other things, the *Certificate of Mailing Plan Supplement and Notice of Filing of Plan Supplement* [Docket No. 224].

6

21.     In advance of the deadline to object to confirmation, the Debtors received informal comments from various parties concerning the Plan, including comments from the United States Trustee and the Subchapter V Trustee. The Debtors worked to resolve these comments by either agreeing to amendments to the Plan or to including language in the order confirming the Plan.

22.     On June 28, 2024, the following objections to confirmation of the First Amended Plan were filed:

   a.   The *Limited Objection and Reservation of Rights* by Paul C. Dougherty and PCD Building Company [Docket No. 217].

   b.   The *Objection of Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare to Amended Subchapter V Plan of Reorganization* by Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare [Docket No. 218].

   c.   The *Objection to the Debtors' Amended Subchapter V Plan of Reorganization* by North Pointe Ventures, LLC [Docket No. 219].

   d.   The *Objection to Confirmation of Plan* filed by Collin County Tax Assessor/Collector [Docket No. 220].

23.     After completing consultations with the United States Trustee and the Subchapter V Trustee concerning a post-confirmation sale process and other revisions to the Plan, on July 5, 2024, the Debtors filed their *Second Amended Plan* [Docket No. 230]. The Second Amended Plan included, among other things, additional details concerning expressions of interest related to the purchase of the Debtors' business, how the Debtors envisioned the sale toggle would function and how proceeds of a consummated post-confirmation sale would be distributed in various scenarios, detailed sale procedures, and additional disclosures concerning the identity of alternative exit financing lenders. A redline of the Second Amended Plan was attached to the *Notice of Filing of*

7

*Second Amended Subchapter V Plan of Reorganization* (the "Second Amended Plan Filing Notice") [Docket No. 231].

24.    Consistent with the Debtors' agreement with the United States Trustee and the Subchapter V Trustee concerning the revisions in the Second Amended Plan, and with the permission of the Court, the Debtors continued the hearing on Confirmation from July 10, 2024, to July 25, 2024, and filed their *Notice of Continued Hearing to Consider Confirmation of Second Amended Subchapter V Plan Filed by the Debtors and Related Deadlines* (the "Continued Confirmation Notice"). The Continued Confirmation Notice notified parties that the Second Amended Plan had been filed, that a redline of the Second Amended Plan had been filed, that the Debtors had agreed to extend the time to file objections concerning the modifications contained in the Second Amended Plan to 4:00 p.m. (Eastern time) on July 19, 2024, that the Debtors had agreed to permit creditors in impaired classes who had voted to change their vote to accept or reject the Plan by 4:00 p.m. (Eastern time) on July 19, 2024, and described procedures for how creditors who wished to change their vote could do so.

25.    Copies of the Second Amended Plan, the Second Amended Plan Filing Notice, and the Continued Confirmation Notice were distributed on July 5, 2024, as evidenced by, among other things, the *Certificate of Mailing of Arnold Nguyen* [Docket No. 235].

26.    On July 19, 2024, the Debtors filed the *Voting Declaration* [Docket No. 253] to certify the tabulation of votes in connection with the Plan.

27.    Contemporaneous with the filing of this Confirmation Brief, the Debtors are filing the *Declaration of Colin Chenault in Support of Confirmation of Debtors' Second Amended Subchapter V Plan of Reorganization* (the "Confirmation Declaration") and the proposed Confirmation Order as an exhibit to the *Notice of Proposed Findings of Fact, Conclusions of Law,*

*and Order Confirming Debtors' Second Amended Subchapter V Plan of Reorganization* (the "Proposed Confirmation Order").

## II.    The Plan Solicitation and Notification Process

28.    Pursuant to section 1126 of the Bankruptcy Code, Class 1(k) (Secured Claim of 510 Lassen LLC), Class 1(m) (Secured Claims of Certain Mechanics Lien Claimants) and Class 4 (General Unsecured Claims) are impaired classes that are entitled to vote on the Plan. 11 U.S.C. § 1126.

29.    The following table summarizes the Classes of Claims and Equity Interests under the Plan and whether such Classes are entitled to vote to accept or reject the Plan:

| Class | Claim/Equity Interest | Status | Entitled to Vote |
|---|---|---|---|
| 1(a) | Secured Claim of David Hassinger for DIP Loan | Unimpaired | No |
| 1(b) | Secured Claim of Hitachi Capital America Corp | Unimpaired | No |
| 1(c) | Secured Claim of Newlane Finance Co. | Unimpaired | No |
| 1(d) | Secured Claim of 1861 Acquisition LLC | Unimpaired | No |
| 1(e) | Secured Claim of Bank Direct Capital Finance | Unimpaired | No |
| 1(f) | Secured Claim of M2 Equipment Finance LLC | Unimpaired | No |
| 1(g) | Secured Claim of Apogee Capital Fund 5 LLC | Unimpaired | No |
| 1(h) | Secured Claim of Mitsubishi HC Capital of America Inc. | Unimpaired | No |
| 1(i) | Secured Claim of Pawnee Leasing Corp. | Unimpaired | No |

9

| 1(j) | Secured Claim of Balboa Capital | Unimpaired | No |
|------|--------------------------------|------------|-----|
| 1(k) | Secured Claim of 510 Lassen LLC | Impaired | Yes |
| 1(l) | Secured Claim of Property Tax Authorities | Unimpaired | No |
| 1(m) | Secured Claim of Certain Mechanics Liens Claimants | Impaired | Yes |
| 2 | Priority Wage Claims | Unimpaired | No |
| 3 | 1122(b) Convenience Class | Unimpaired | No |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5(a) | Equity Interests in Pioneer Health Systems LLC | Unimpaired | No |
| 5(b) | Equity Interests in DOC Corporate Group LLC | Unimpaired | No |
| 5(c) | Equity Interests in DOC LLC | Unimpaired | No |
| 5(d) | Equity Interests in DOCTX3 PLLC | Unimpaired | No |
| 5(e) | Equity Interests in PAS Services PLLC | Unimpaired | No |

30.     The voting results, as reflected in the Voting Declaration, are summarized as follows:

| Total Ballots Counted | | | | | |
|---|---|---|---|---|---|
| | Accepting | | Rejecting | | Class Voting Result |
| Voting Class | Amount | Number | Amount | Number | |
| **Class 1(k)** Secured Claim of 510 Lassen LLC | $17,983.91 (0.0%) | 1 (100.0%) | $0.0 (0.0%) | 0 (0.0%) | Accept |
| **Class 1(m)** Secured Claim of Certain Mechanics Liens Claimants | $40,468.73 (0.0%) | 1 (100.0%) | $0.00 (0.0%) | 0 (0.0%) | Accept |
| **Class 4** General Unsecured Claims | $10,708,016.95 (77.89%) | 16 (80.0%) | $3,039,099.21 (21.11%) | 4 (20.0%) | Accept |

31.     As set forth above and in the Voting Declaration, Classes 1(k), 1(m), and 4 were the only classes entitled to vote under the Plan. Each class voted to accept the Plan.

32.     Classes 1(k) and 1(m) were each impaired and are made up entirely of non-insiders. *See* Chenault Decl. ¶ 29.r. The only votes received in Classes 1(k) and 1(m) were in favor of accepting the Plan. Ballots submitted by Holders of General Unsecured Claims in Class 4, including the votes of various insiders of the Debtors, voted to accept the plan under both the numerosity and amount factors.

## **ARGUMENT**

## I.     **The Plan Satisfies the Disclosure Requirements of 11 U.S.C. § 1190**

33.     Pursuant to section 1190 of the Bankruptcy Code, a plan filed under Subchapter V:

(1) shall include—

(A) a brief history of the business operations of the debtor;

(B) a liquidation analysis; and

(C) projections with respect to the ability of the debtor to make payments under the proposed plan of reorganization;

(2) shall provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan . . . .

11 U.S.C. § 1190(1)-(2).

34.     Article 1 of the Plan provides a detailed "History of the Business Operations of the Debtors," including subsections entitled "Nature of the Debtors' Business," "History of Business Operations of the Debtors," "Filing of the Debtors' Chapter 11 Case," "Legal Structure and Ownership," "Debtors' Assets," "Debtors' Liabilities," "Current and Historical Financial Conditions," "Events Leading to Filing of the Bankruptcy Cases," "Significant Events During the Bankruptcy Cases," and "Projected Recovery of Avoidable Transfers." These sections describe key events which have transpired before and during the Bankruptcy Cases and satisfy section 1190(1)(A) of the Bankruptcy Code. Further, a Liquidation Analysis, showing that Creditors will receive an amount greater under the Plan than the liquidation value, was attached as **Exhibit H** to the Plan, thereby satisfying section 1190(1)(B) of the Bankruptcy Code. Finally, the Debtors attached financial projections, as **Exhibit C** to the Plan, evidencing their ability to make payments under the Plan, and satisfying section 1190(1)(C) of the Bankruptcy Code.

35.     Additionally, the Plan submits all of the Debtors' projected disposable income— including any cash proceeds from a possible post-confirmation sale of the Debtors or their assets during the nearly five-year period of the Plan—to the repayment of claims. Accordingly, the Plan satisfies section 1190 and should be confirmed.

## II. The Plan Satisfies the Confirmation Requirements of a Consensual Plan Under 11 U.S.C. § 1191(a)

36.     A Subchapter V plan may be confirmed consensually under section 1191(a) of the Bankruptcy Code if all requirements of section 1129(a) other than subsection 1129(a)(15) are met. 11 U.S.C. § 1191(a). If a consensual plan is confirmed under section 1191(a), the Subchapter V Trustee's service is terminated upon "substantial consummation." 11 U.S.C. § 1183(c). Also, if a consensual plan is confirmed under section 1191(a), the debtor receives its discharge on the effective date of the plan under section 1141(d). *See also* 11 U.S.C. §§ 1181(c) and 1192.

37.     Alternatively, if sections 1129(a)(8), (10), and (15) are not met, a plan can be confirmed on a non-consensual basis under section 1191(b), so long as the plan does not unfairly discriminate as to classes of creditors and interest that did not accept the plan.

38.     Here, the Plan is consensual. As more particularly described in the Voting Declaration, all classes entitled to vote on the Plan voted to accept the Plan. *See* Voting Declaration, Ex. A. Accordingly, section 1129(a)(8) is satisfied. Classes 1(k) and 1(m) consist entirely of non-insiders and both voted to accept the Plan. *See* Chenault Decl. ¶ 29.r. As there is at least one impaired consenting class accepting the Plan, section 1129(a)(10) is satisfied. As these Bankruptcy Cases do not concern individuals, section 1129(a)(15) is inapplicable.

39.     Thus, as discussed more fully below, the Plan satisfies section 1191(a) and should be confirmed as a consensual plan under Subchapter V.

## III. The Plan Satisfies the Applicable Provisions of 11 U.S.C. § 1129(a)

### A. The Plan Complies with Section 1129(a)(1)

40.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan "complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of 11 U.S.C. § 1129(a)(1) explains that this provision encompasses the requirements of 11 U.S.C.

§§ 1122 and 1123 governing classification of claims and contents of a plan, respectively. H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986); *In re Johns-Manville Corp.*, 843 F.2d 636 (2nd Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

41.     As discussed herein, the Plan fully complies with all of the applicable provisions of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code and, therefore, it should be confirmed.

### 1.     The Plan Complies with the Requirements of Section 1122

42.     Section 1122 provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to other claims or interests of such class." 11 U.S.C. § 1122(a). Courts have recognized that plan proponents have significant flexibility under section 1122 in classifying claims. *See Frito-Lays Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2nd Cir. 1993) (affirming separate classification where rational basis existed for classification scheme). Plan proponents have flexibility in classifying claims, with some review for the basis for the classification and substantial similarity of the claims. *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar.") (citation omitted). Similarly, absent an adequate business justification, general unsecured claims comprise one class of claims. *In re 266 Washington Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y.) ("It has accordingly been observed that 'unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor.'" (alteration and citations omitted)), *aff'd sub nom. In re Washington Assocs.*, 147 B.R. 827 (E.D.N.Y. 1992).

43.     Here, the Plan contains 21 separate classes of claims and interests, with each class containing substantially similar claims or interests as required by section 1122—13 classes of secured claims (Classes 1(a)-1(m)), Priority Wage Claims (Class 2), an 1122(b) convenience class for small claims (Class 3), and General Unsecured Claims (Class 4), and five classes of equity interests (Classes 5(a)-5(e)). Each of the classes are dissimilar and each claim in a particular class is substantially similar to the other claims in that class.

44.     As discussed below, MSC objects to confirmation of the Plan asserting that the claims of certain creditors arising from various unsecured promissory notes and convertible promissory notes should be separately classified from other general unsecured creditors. The Debtors did not discern an adequate business justification for the separate classification and, hence, do not believe there are grounds for separate classification of claims arising from the notes. *See In re 266 Washington Assocs.*, 141 B.R. at 282. As these claims (i) arise from an instrument entitled a promissory note, (ii) require payment of regular interest, (iii) have a defined maturity date, and (iv) have other indicia of a debt instrument, the Debtors could not identify a basis to separately classify these claims. Chenault Decl. ¶ 10. Therefore, the claims are properly classified.

45.     Based on the foregoing, the Debtors submit the Plan complies with the provisions of section 1122 and should be confirmed.

**2.      The Plan Satisfies the Mandatory Requirements of Section 1123(a)**

46.     The Plan complies with the applicable provisions of section 1123(a).

**a.      Section 1123(a)(1)**

47.     Section 1123(a)(1) requires a plan to designate classes for all claims and interests, other than the types of claims specified in section 507(a)(2) (administrative expense claims), section 507(a)(3) (claims arising during the "gap" period in an involuntary bankruptcy case) and 507(a)(8) (priority tax claims). 11 U.S.C. § 1123(a)(1). The Plan expressly classifies all claims and

interests against the Debtors, other than Administrative Claims and Priority Tax Claims, which are unclassified under the Plan.

### b.    Section 1123(a)(2)

48.    Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). Article 2 of the Plan identifies 11 classes of secured claims (Classes 1(a)-(j), 1(l)), priority wage claims (Class 2), convenience class claims as unimpaired (Class 3, and five classes of Equity Interests (Classes 5(a)-(e)) as unimpaired. This requirement is satisfied.

### c.    Section 1123(a)(3)

49.    Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). Article 2 of the Plan details the treatment of the secured claim of 510 Lassen LLC (Class 1(k)), the secured claim of certain mechanic's liens claimants (Class 1(m)), and General Unsecured Claims (Class 4) as the only impaired classes under the Plan. This requirement is satisfied.

### d.    Section 1123(a)(4)

50.    Section 1123(a)(4) requires that a plan provide that each claim or interest in a particular class receive the same treatment as other members of the same class. 11 U.S.C. § 1123(a)(4). Article 2 of the Plan satisfies this requirement by providing that each claim or interest that is classified in a particular Class under the Plan will receive the same treatment as the other claims and interests included in such Class.

### e.    Section 1123(a)(5)

51.    Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth examples of typical means for implementing a plan. 11 U.S.C. § 1123(a)(5). The Plan provides that it will be funded by the proceeds realized from the operations

16

of the Debtors or, in the event of a sale of the Debtors or their assets, from the proceeds of that sale. On Confirmation of the Plan, all property of the Debtors, both tangible and intangible, will revert to the Debtors, free and clear of all Claims and Equitable Interests except as provided in the Plan. Further, the Plan specifies that the Debtors' current CEO/Managing Member, Chief Clinical Officer, Chief Financial Officer, and Chief Operating Officer shall remain with the Reorganized Debtors after the Effective Date, pursuant to section 2.7 of the Plan. Based on the foregoing, the Debtors submit the Plan complies with the requirements of section 1123(a)(5) of the Bankruptcy Code.

### f.    Section 1123(a)(6)

52.    Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of non-voting equity securities and requires that a reorganized debtor's charters so provide. The Plan does not provide for issuance of non-voting equity securities. Hence, this section of the Bankruptcy Code is inapplicable.

### g.    Section 1123(a)(7)

53.    Section 1123(a)(7) requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). Here, Holders of Equity Interests will maintain their existing Equity Interests as they existed on the Petition Date and applicable nonbankruptcy law. Further, as stated above, the Plan specifies that the Debtors' current CEO/Managing Member, Chief Clinical Officer, Chief Financial Officer, and Chief Operating Officer shall remain with the Reorganized Debtors after the Effective Date, pursuant to Section 2.7 of the Plan. As such, the Plan complies with this section.

**h.    Section 1123(a)(8)**

54.    Section 1123(a)(8) requires that, in a case in which the debtor is an individual, the plan provides for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan. 11 U.S.C. § 1123(a)(8). This section of the Bankruptcy Code is inapplicable because the Debtors are limited liability companies and professional limited liability companies.

**3.    The Release Provision and the Exculpation Provision Under the Plan Are Consistent with Section 1123(b)**

55.    Plan provides for the releases of certain claims by the Debtor and the Reorganized Debtors (the "Debtor Releases") of their advisors and attorneys (the "Released Parties"). Furthermore, the Plan exculpates estate fiduciaries that are critical to the Bankruptcy Cases (the "Exculpation Provision"). The Debtor Releases and the Exculpation Provision are integral components of the Plan, are consistent with the Bankruptcy Code, and comply with applicable case law and recent precedent, and, as such, should be approved.

**a.    The Debtor Releases Are Appropriate and Should be Approved**

56.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a Chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or the estate." *See* 11 U.S.C. § 1123(b)(3)(A); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that the standard for approval of a settlement under section 1123 of the Bankruptcy Code is generally the same as under Bankruptcy Rule 9019). Courts in the Third Circuit typically approve a settlement by a debtor if the settlement "exceed[s] the lowest point in the range of reasonableness." *See*, *e.g.*, *In re Coram Healthcare*, 315 B.R. at 330 (citations omitted); *In re Exaeris, Inc.*, 380 B.R. 741, 746-47 (Bankr. D. Del. 2008) (citations

4890-1912-1362\9

omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that the settlement must be "within the reasonable range of litigation possibilities") (internal quotation marks omitted). Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing section 1123(b)(3)(A) of the Bankruptcy Code) (internal quotation marks omitted).

57.      Section 6.9 of the Plan provides for a customary release of any and all Causes of Action, including derivative claims, of the Released Parties, except for claims for willful misconduct, gross negligence, or fraud.

58.      The Debtor Releases are a valid exercise of the Debtors' business judgment, and are fair, reasonable, and in the best interests of the Debtors' Estates. The Released Parties made valuable contributions to the restructuring process and efforts to negotiate and implement the Plan. Among other things, the Released Parties participated in negotiations with the Debtors in connection with the development of the Plan that ultimately resulted in a confirmable Plan and are integral for implementation of the Plan.

59.      The Debtor Releases are essential to the Plan because they constitute an integral part of the restructuring. As described above, each of the Released Parties made contributions to the Bankruptcy Cases or will do so as a means to implement the Plan and did or will do so with the understanding that they would receive releases from the Debtors. Without the Released Parties' support, the Debtors would not be in a position to confirm the Plan.

60.      Accordingly, the Debtor Releases are fair and equitable and in the best interests of the Debtors' Estates and should be approved.

### b.    The Exculpation Provision Should be Approved

61.    An exculpation provision is not a mandatory release of all liability, but instead, establishes the appropriate standard of liability with respect to the parties exculpated. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3rd Cir. 2000) (reasoning that the exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability"); *see also In re Enron Corp.*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (in finding creditors' appeal of confirmation based on the plan's exculpation provision moot, the court specifically noted that the bankruptcy court addressed the exculpation provision and found it appropriate because it excluded gross negligence and willful misconduct). In order to confirm a plan of reorganization, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code. Additionally, the Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law. These findings apply to the Debtors and, by extension, to the Debtors' officers, employees, advisors, and professionals. Further, these findings evidence that the Plan was negotiated at arm's length and in good faith. Insofar as the Debtors negotiated various issues during the course of the Bankruptcy Cases, as well as the terms of the Plan, with the other Exculpated Parties, the Court's good faith findings with respect to the Debtors' Bankruptcy Cases should extend to them.

62.    Further, it is well established that exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir. 1992); *Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

63.     Article 6.8 of the Plan exculpates parties[4] with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtors' Bankruptcy Cases. The Exculpated Parties were critical to the Bankruptcy Cases, and specifically, the formulation of the Plan. The Debtors ask that the Court find that the Exculpated Parties participated in good faith with respect to the Bankruptcy Cases for the same reasons discussed in section III.C. *infra*. Negotiation and compromise were crucial to the conduct of the Bankruptcy Cases generally and the formulation of a feasible Plan and could not have occurred without the protection from liability that the Exculpation Provision provides to the Exculpated Parties.

64.     Further, the Exculpation Provision, which is limited to estate fiduciaries and includes the carve out for gross negligence and willful misconduct, is consistent with established practice in this jurisdiction and others and should be approved. *See*, *e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 235, 245 (3rd Cir. 2000) (approving plan provision that released claims except as to willful misconduct or gross negligence and characterizing such a provision as "commonplace . . . in Chapter 11 plans"); *In re Wash Mut. Inc.*, 442 B.R. at 350 (noting that the "Third Circuit has held that a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence"). Accordingly, the Exculpation Provision does not amount to a stark departure from other Chapter 11 plans confirmed in this district. *See*, *e.g.*, *In re VER Technologies HoldCo, LLC*, No. 18-10834 (KG) (Bankr. D. Del. July 26, 2018); *In re Sea Containers Ltd.*, No. 06-11156 (KJC)

---

[4] The "Exculpated Parties" are "[c]ollectively, and in each case in their capacity as such during the Subchapter V Cases, (a) the Debtors, (b) the Debtors' members, directors, and officers serving between the Petition Date and the Effective Date, (c) each professional retained by the Debtors, and (d) the [Subchapter V] Trustee." Second Amended Plan § 9.37.  To resolve an element of the objection of MSC, the Debtors will remove the reference to "members" in the definition of Exculpated Parties.

(Bankr. D. Del. Nov. 24, 2008); *In re ACG Holdings*, No. 08-11467 (CSS) (Bankr. D. Del. Aug. 6, 2008); *see also In re DJK Residential LLC*, No. 08-10375, (Bankr. S.D.N.Y. May 7, 2008) (approving an exculpation provision that excluded gross negligence and willful misconduct without unresolved objections); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y Sept. 7, 2007).

65.     Therefore, the Court should approve the Exculpation Provision and adopt the appropriate standard of liability for the Exculpated Parties with respect to Exculpated Claims.

**B.     The Plan Complies with Section 1129(a)(2)**

66.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan "compl[y] with the applicable provisions" of the Bankruptcy Code, which generally is intended to ensure that a plan proponent has complied with the requirements of the Bankruptcy Code governing the solicitation of acceptances of a plan. *See In re Texaco Inc.*, 84 B.R. 893, 906-07 (Bankr. S.D.N.Y. 1988).

67.     In accordance with the Solicitation Order, the Debtors, via their voting and solicitation agent, have tabulated the ballots submitted by creditors and timely filed its Voting Declaration. The Debtors, therefore, submit that section 1129(a)(2) of the Bankruptcy Code has been satisfied.

**C.     The Plan Complies with Section 1129(a)(3)**

68.     Section 1129(a)(3) requires that a Chapter 11 plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code" in light of the particular facts and circumstances of the case. *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3rd Cir. 2004); *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3rd Cir. 2000)

(quoting *In re Madison Hotel Associates*, 749 F.2d 410, 424-25 (7th Cir. 1984)); *In re Burns &
Roe Enters.*, No. 08-4191 (GEB), 2009 U.S. Dist. LEXIS 13574, at \*78 (D.N.J. Feb. 20, 2009).

69.    The Debtors' good faith in proposing the Plan is more than evident. Although not
defined by the Bankruptcy Code, "good faith" has been described to include (i) a showing the plan
was proposed with honesty and good intentions, and (ii) the existence of a reasonable likelihood
that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy
Code. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2nd Cir. 1988); *see also Traders
State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1989)
(interpreting analogous provision under Chapter 12); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr.
S.D. Cal. 1982). Moreover, "[w]here the plan is proposed with the legitimate and honest purpose
to reorganize and has a reasonable hope of success, the good faith requirement of
section 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).
The requirement of good faith must be viewed in light of the totality of the circumstances
surrounding the establishment of a Chapter 11 plan. *Id.*

70.    Both MSC and North Pointe oppose confirmation because they disagree with the
Debtors' decision, which was reached after the Debtors received multiple expressions of interest
in a potential sale transaction, to pursue a value maximizing, post-confirmation sale. As discussed
in further detail below, these objections are without merit. In light of competing offers, and at least
one additional expression of interest received since the filing of the Second Amended Plan, the
Debtors are obligated to run a marketing and sale process to ensure they obtain maximum value
for all stakeholders. The Debtors' proposed post-confirmation sale process is indicative of their
good faith, not bad faith.

\* \* \*

71.     The Plan is the product of arms-length negotiation with the DIP Lender, the Subchapter V Trustee, and the Office of the United States Trustee. This groundwork resulted in a consensual plan, with each class of impaired claims voting to accept the Plan. Thus, there is substantial support for the Court finding that the Plan has been proposed in good faith and not by any means forbidden by law. Hence, the Plan complies with section 1129(a)(3) of the Bankruptcy Code and should be confirmed.

### D.     The Plan Complies with Section 1129(a)(4)

72.     Section 1129(a)(4) requires that payments "for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case," be approved by the Court as reasonable. 11 U.S.C. § 1129(a)(4). In other words, section 1129(a)(4) requires that the Court review and approve any payments on account of non-ordinary course administrative expenses. *See*, *e.g.*, *In re Resort Int'l, Inc.*, 145 B.R. 412, 475–76 (Bankr. D.N.J. 1990); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (Bankruptcy Code section 1129(a)(4) satisfied where plan provides for payment of "allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988). Under the Plan, each estate professional must file and serve a properly noticed fee application, and pursuant to the Bankruptcy Code, only the amount of fees allowed by the Court will be paid. Accordingly, this section of the Bankruptcy Code is satisfied.

### E.     The Plan Complies with Section 1129(a)(5)

73.     Section 1129(a)(5) requires that (i) the plan proponent disclose the identity of any individual that will serve after confirmation of the plan as a director, officer, or voting trustee of the debtor or that will be a successor to the debtor under the Plan and that the appointment of any such individual be consistent with the interests of creditors and shareholders and public policy and (ii) the plan proponent disclose the identity of any insider that will be employed by the reorganized

debtor and the nature of the compensation that they will receive. 11 U.S.C. §§ 1129(a)(5)(A), (B). This section is satisfied because Section 2.7 of the Plan states that Debtors' current CEO/Managing Member, Chief Clinical Officer, Chief Financial Officer, and Chief Operating Officer shall remain to serve the Reorganized Debtors after the Effective Date, identifies each of these officers by name, and describes their annual compensation. Therefore, section 1129(a)(5) of the Bankruptcy Code is satisfied.

### F.    The Plan Complies with Section 1129(a)(6)

74.    Section 1129(a)(6) requires that any regulatory commission with jurisdiction over the rates of a debtor approve any changes in rate regulations provided in a plan. 11 U.S.C. § 1129(a)(6). The Debtors are not subject to any such regulation and the Plan does not propose any such rate changes, thus this section is inapplicable.

### G.    The Plan Complies with Section 1129(a)(7)

75.    Section 1129(a)(7) requires that, with respect to each class of impaired claims or interests under a plan, every holder of a claim or interest in such impaired class either (i) accept the plan, or (ii) receive or retain property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7). This is often referred to as the "Best Interests of Creditors Test." Under the Best Interests of Creditors Test, the court "must find that each [non-accepting] creditor will receive or retain value that is not less than the amount he would receive if the debtor were liquidated [under Chapter 7 of the Bankruptcy Code]." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 440 (1999); *United States v. Reorganized CF&I Fabricators, Inc.*, 518 U.S. 213, 228 (1996). The best interests test focuses on individual dissenting creditors rather than classes of claims. *See 203 N. LaSalle St. P'ship*, 526 U.S. at 440.

76.     Here, as described in the Plan, the Debtors have put forth affirmative evidence showing that general unsecured creditors will fare better under the Plan than in a Chapter 7 liquidation. The Liquidation Analysis demonstrates that Holders of General Unsecured Claims (Class 4) are projected to receive under the Plan more than the estimated distribution they would expect to receive in a hypothetical Chapter 7 liquidation. The Debtors have also filed concurrently herewith, the Confirmation Declaration, which reaffirms both the liquidation and disposable income analysis in the Plan. Accordingly, the Plan satisfies the Best Interest of Creditors Test.

**H.      The Plan Complies with Section 1129(a)(8)**

77.     Section 1129(a)(8) requires that each class of claims and interests established under a plan either accept the plan or not be impaired under the plan. 11 U.S.C. § 1129(a)(8). A class of claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class vote to accept the plan, counting only those claims whose holders actually vote. *See* 11 U.S.C. §§ 1126(c)–(d).

78.     As set forth in the Voting Declaration and summarized above, each class of impaired claims voted to accept the Plan. Hence, the Plan complies with section 1129(a)(8).

**I.      The Plan Complies with Section 1129(a)(9)**

79.     Bankruptcy Code section 1129(a)(9) provides that, unless the holder of a claim agrees to a different treatment of its claim:

a.  the holder of a claim entitled to priority under section 507(a)(2) or (3) must receive cash equal to the allowed amount of its claim on the effective date of the plan;

b.  the holder of a claim entitled to priority under section 507(a)(1), (4), (5), (6), or (7) must receive either cash in the allowed amount of such claim on the effective date of the plan or deferred cash payments of a value, as of the effective date, equal to the allowed amounts of such claim; and

c.  the holder of a tax claim entitled to priority under section 507(a)(8) must receive on account of such claim deferred cash payments, over a period not exceeding six years

26

after the date of assessment of such claim, of a value, as of the effective date of a plan, equal to the allowed amount of such claim.

11 U.S.C. § 1129(a)(9).

80.    Section 2.1 of the Plan provides for payment of the professional fees of the Debtors' professionals and the Subchapter V Trustee—the only known administrative expense claimants—in full in cash after allowance of their fee applications.

81.    Pursuant to the Court's *Order (I) Authorizing, But Not Directing, the Payment of Certain Taxes and Fees; and (II) Granting Related Relief* (the "Taxes Order") [Docket No. 92], the Debtors have been paying their tax obligations in the ordinary course. Hence, the Debtors do not anticipate any priority (or secured) tax claims. Nevertheless, at the request of various state taxing authorities, the Debtors have agreed to include in the Confirmation Order language that confirms that any priority or secured tax claims that are past due will be paid in full on or before the Effective Date, and that going forward taxes will be paid in the ordinary course.

82.    Allowed priority wage claims under section 507(a)(4) are treated in Class 2 and will be paid in full on the Effective Date, or at the time such claims become Allowed Claims.

83.    Accordingly, the Plan complies with section 1129(a)(9).

**J.    The Plan Complies with Section 1129(a)(10)**

84.    Section 1129(a)(10) requires that at least one class of claims that is impaired under the plan has voted to accept the plan, determined without including any acceptance of the plan by any insider. 11 U.S.C. § 1129(a)(10). As set forth in the Voting Declaration, Classes 1(k) and 1(m) are impaired classes that voted to accept the Plan. As set forth in the Chenault Declaration, both Classes 1(k) and 1(m) consist entirely of non-insiders. Therefore, the Plan complies with section 1129(a)(10).

K.    **The Plan Complies with Section 1129(a)(11)**

85.    Section 1129(a)(11) requires a court to find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). A plan proponent must prove a Chapter 11 plan's feasibility by the preponderance of evidence. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) (rejecting "clear and convincing" as the applicable standard). The threshold of proof necessary to satisfy the requirement is relatively low. *See In re Sea Garden Motel and Apartments*, 195 B.R. 294, 304 (Bankr. D. N.J. 1996). To demonstrate that a plan is feasible, it is not necessary that success be guaranteed. *See In re Landing Assoc., Ltd.*, 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) (noting that no plan can offer absolute certainty and that section 1129(a)(9) requires only that the plan offer a reasonable probability of success). Rather, a bankruptcy court must determine whether a plan is workable and has a reasonable likelihood of success. *See U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *IRS v. Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3rd Cir. 1997).

86.    Here, the Plan includes a five-year financial projection attached thereto as **Exhibit C**, which demonstrates the Debtors' ability to make all of the payments due on the Effective Date and thereafter. The Plan will be funded with funds that are not for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors, or in the event of a sale transaction, from the proceeds of the sale transaction. The Debtors' financial projections show that the Debtors will have cash flow after paying operating expenses and post-confirmation taxes to meet their obligations under the Plan. All projected disposable income is devoted to paying Allowed Claims under the Plan.

87.     As reflected in the Debtors' financial projections attached to the Plan, the Debtors are capable of funding the Disposable Income Fund—the source of payments for unsecured creditors over the life of the Plan. Payments from the Disposable Income Fund to General Unsecured Creditors will commence by February 14, 2026, or earlier in the event of a sale transaction. With respect to the DIP Lender's Secured Claim, the DIP Loan will be retired by the Exit Facility. The projections demonstrate the Debtors' ability to repay the Exit Facility. All other unimpaired secured claims will be paid in the ordinary course of business.

88.     Additionally, the Debtors will have sufficient cash on hand on the Effective Date to pay all of the Claims and expenses that are entitled to be paid on that date. Finally, the Debtors will be able to satisfy Allowed General Unsecured Claims, as set forth in the Plan, until the last distribution date, with such payments currently expected to last for about five years. Therefore, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors, thereby satisfying (or eliminating the need to consider) section 1129(a)(11) of the Bankruptcy Code.

**L.     Section 1129(a)(12) is Inapplicable**

89.     Section 1129(a)(12) of the Bankruptcy Code requires that a plan provide that all fees payable under 28 U.S.C. § 1930 be paid on or before the effective date of the plan. Here, the Debtors have elected to proceed under Subchapter V of Chapter 11 of the Bankruptcy Code where such fees are not due by the Debtors. Accordingly, this section of the Bankruptcy Code is inapplicable.

**M.     Section 1129(a)(13) is Inapplicable**

90.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code. The Debtors do not have any present obligations to pay retiree benefits

29

within the meaning of section 1129(a)(13). Accordingly, this section of the Bankruptcy Code is inapplicable.

**N.      Section 1129(a)(14) is Inapplicable**

91.      Section 1129(a)(14) requires that, if applicable, the debtor pay all domestic support obligations. Here, the Debtors are limited liability companies and professional limited liability companies. None of the Debtors are required by any judicial or administrative order to pay domestic support obligations. As such, this section of the Bankruptcy Code is inapplicable.

**O.      Section 1129(a)(15) is Inapplicable**

92.      Pursuant to section 1181(a), section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Subchapter V cases. Section 1191 also expressly provides that a consensual plan confirmed under section 1191(a), as is the situation here, need not comply with section 1129(a)(15). In either case, section 1129(a)(15) of the Bankruptcy Code is inapplicable.

**P.      Section 1129(a)(16) is Inapplicable**

93.      Section 1129(a)(16) requires that transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. This section is inapplicable as the Plan calls for no such transfers.

\* \* \*

94.      Because the Plan complies with section 1129(a), it may be confirmed under section 1191(a).

**IV.      Modifications to the Plan Supplement Do Not Require Resolicitation**

95.      Following filing of the Plan Supplement, the Debtors continued to negotiate with the proposed lender for the Exit Facility and with other possible lenders who could offer financing on materially better terms. The Debtors ultimately entered into terms sheets with two lenders to

provide a total of $1.15 million in exit financing to the Debtors, slightly less than the original forecasted need of $1.2 million, on materially better terms than those originally proposed in the Plan Supplement. Concurrently with filing of this Confirmation Brief, the Debtors will file, and serve notice of, an amended Plan Supplement (the "Amendment"). The modifications reflected in the Amendment are technical in nature and relate principally to incorporating the new terms for the Exit Facility: a $450,000 term loan (the "Term Loan") which the Debtors will use to retire the DIP Loan, and a $700,000 revolving line of credit (the "Line of Credit") which the Debtors will use to meet their intramonth liquidity needs. The Debtors are also filing concurrently herewith revised projections demonstrating the ability to repay the Term Loan and fund the proposed sale process. As set forth below, the inclusion of the Term Loan and the Line of Credit in the Amendment, as well as the other technical amendments to the Plan, do not require resolicitation of the Plan.

96.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time prior to confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. 11 U.S.C. § 1127(a). Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the operative plan. *Id.* Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder. Fed. R. Bankr. P. 3019(a).

97.    In interpreting Bankruptcy Rule 3019, courts have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed

modification is not material or does not adversely affect the way creditors and stakeholders are treated. *See Nat'l Union Fire Ins. v. BSA (In re BSA)*, 650 B.R. 87, 168 (D. Del. 2023) ("A plan modification is immaterial unless it will so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." (citation omitted)); *see, e.g., In re Glob. Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191 (GEB), 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

98.     The changes to the Exit Facility are not material and do not require resolicitation. Combined, the Term Loan and the Line of Credit provide the Debtors with the liquidity they need to operate and retire the outstanding balance on the DIP Loan in a total amount substantially similar to the amount contemplated by the Second Amended Plan. Chenault Decl. ¶ 22. As discussed in the Chenault Declaration, the terms of the Term Loan and the Line of Credit are materially better for the Debtors, in that the interest rate and fee structure are more favorable to the Debtors and the Debtors may prepay both the Term Loan and the Line of Credit without penalty. *Id.* The Term Loan is offered by TFGH Ventures LLC, a party unrelated to the Debtors. *Id.* The Line of Credit is offered by Bonito Kitty, LLC, an entity controlled by Dr. Hassinger. *Id.* The fact that Dr. Hassinger could provide Exit Financing was disclosed in the Second Amended Plan that was served on all creditors, and creditors were provided with opportunity to change their vote or object. Even after that notice and opportunity, the Plan remains consensual.

99.     Importantly, the proposed Term Loan and the Line of Credit do not change the treatment of claims under the Plan. Access to a committed future source of liquidity will not change

32

4890-1912-1362\9

the manner in which the Reorganized Debtors will be capitalized and will similarly not change the treatment of creditors and interest holders provided under the Plan or their economic position. Moreover, nothing in the solicitation version of the Plan prohibits the Reorganized Debtors from obtaining financing or modifying their capital structure after emergence from bankruptcy. Thus, the Debtors use of the Term Loan and the Line of Credit is consistent with the terms of and treatment of creditors under the Plan.

100.    The Debtors thus submit that the modifications reflected in the Amendment are immaterial. Accordingly, resolicitation of the Plan is unnecessary and this Court should find that the modifications reflected in the Amendment are deemed accepted by all creditors who previously voted to accept the Plan.

**V.    The Unresolved Objections to Confirmation of the Plan Should be Overruled**

    **A.    Objection of Medport Billing, LLC and MSC Holdings, LLC d/b/a SyndeoCare to Amended Subchapter V Plan of Reorganization [Docket No. 218]**

101.    MSC is a litigation claimant asserting claims arising from prepetition factoring agreements between PAS Services PLLC and Syndeocare LLC, MSC's predecessor. MSC objects to the Plan asserting (i) a late and improperly-asserted challenge to the Debtors' Subchapter V elections;[5] (ii) that insiders who hold claims on account of notes should not retain their interests under the Plan; (iii) that insider claims should be equitably subordinated, recharacterized, or classified separately from other unsecured claims, and (iv) that the exculpation provisions are too broad.[6] MSC has specific animus to terms of the Plan that provide recoveries or future

---

[5] This element of MSC's objection is addressed in Section V.C. of this Confirmation Brief.

[6] As discussed in section III.A.3.b. of this brief, the Debtors will agree to narrow the definition of Exculpated Parties to remove references to "members." *See also* Footnote 4, *supra*. The Debtors assert this change resolves MSC's objection as to this point.

compensation to DIP lender, CEO, and noteholder Dr. David Hassinger. MSC also argues the Plan should not be confirmed on account of the entire fairness standard under Delaware law and attempts to challenge the Debtors' Subchapter V elections. MSC's arguments are contrary to or unsupported by the Bankruptcy Code, the Bankruptcy Rules, and case law, and MSC's objection should be overruled for the reasons provided below.

### 1.   Retention of Equity Interests

102.   MSC takes issue with equity holders retaining their interest pursuant to the Plan. The ability for a debtor to reorganize with equity retaining interests is a central policy of Subchapter V, effectuated by the elimination of the absolute priority rule from applicable cramdown requirements. As framed by the U.S. Court of Appeals for the Fourth Circuit:

> One of the main features of a Subchapter V proceeding is its authorization of plans that are not consented to by creditors and that depart from the absolute priority rule of § 1129(b). Under the governing rules of a Subchapter V proceeding, the bankruptcy court need only find that such a plan provide that all of the debtor's projected disposable income is paid to creditors for a 3- to 5-year period and that it be feasible. 11 U.S.C. § 1191(c)(2)(A) and (3). Thus, the owners of a Subchapter V debtor are able to retain their equity in the bankruptcy estate despite creditors' objections.

*Cantwell-Cleary Co. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509, 514 (4th Cir. 2022).

103.   Subchapter V provides for consensual and cramdown confirmation of plans. Section 1191(a) of the Bankruptcy Code is applicable to consensual confirmation. It requires a debtor to meet all the requirements of section 1129(a), except section 1129(a)(15) regarding disposable income for individual debtors. Hence, under sections 1191(a) and 1129(a)(8), all impaired classes must accept the plan.

104.   Section 1191(b), which provides for cramdown confirmation, eliminates from Subchapter V cases the "absolute priority rule"—the prohibition on a debtor's equity interest

34

holders from retaining any property without payment in full of allowed unsecured claims—as well as section 1129(a)'s requirements that all impaired classes accept the plan or at least one impaired class of creditors accepts the plan. *See In re Chip's Southington, LLC*, No. 20-21458 (JJT), 2021 Bankr. LEXIS 3133, at *14 n.5 (Bankr. D. Conn. Nov. 13, 2021) ("Section 1191(b) does not incorporate the absolute priority rule that applies in traditional Chapter 11 cases"). The absolute priority rule, therefore, does not apply in Subchapter V cases, which means that a Subchapter V plan may be crammed down on unsecured creditors even if stockholders, who are junior to unsecured creditors, retain their equity under the plan."). Section 1191(b) requires that the plan not discriminate unfairly and be fair and equitable with respect to each class of impaired claims or interests.

105.    Section 1191(c) sets forth requirements for a plan to be fair and equitable. A plan must, among other things, provide for the debtor's projected disposable income for a three- to five-year period be applied to payments under the plan and be feasible. Thus, equity holders can retain their interests under a Subchapter V plan under either a consensual or cramdown scenario.

106.    Here, the Plan providing for retention of interests by equity holders has been accepted by all impaired classes of claims, resulting in a consensual confirmation. However, even if that was not the case, the Court could still confirm the Plan under section 1191(b), because the absolute priority rule does not apply to Subchapter V cases and the Debtors are committing all of their projected disposable income over the next approximately five years to payment of claims under the Plan.

### 2.    The Debtors Are Not Required to Separately Classify Various Types of General Unsecured Claims

107.    Section 1122 of the Bankruptcy Code requires that claims in a class be "substantially similar" to other claims in that class. 11 U.S.C. § 1122(a). Courts hold that debtors

may (not must) separately classify similar claims based on a legitimate business reason, supported by evidence. *In re Consol. Land Hldgs., LLC*, No. 6:19-bk-04760-KSJ, 2021 Bankr. LEXIS 2270, at *10 (Bankr. M.D. Fla. Aug. 20, 2021); *In re LightSquared Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014); *In re Mallinckrodt PLC*, 639 B.R. 837, 857 (Bankr. D. Del. 2022). However, these arrangements are subject to scrutiny for gerrymandering or unfair discrimination. *See Consol. Land Hldgs.*, 2021 Bankr. LEXIS, at *10-14.

108.    MSC wishes for equity holders who also hold general unsecured claims to be separately classified from other types of general unsecured claimholders in order for equity holders holding unsecured claims to receive disparate treatment—e.g., being paid after other general unsecured claimholders.[7] MSC Obj. ¶¶ 36, 46-48. Neither the Bankruptcy Code nor court-made permissions require the Debtors to separately classify various types of general unsecured claims. In fact, the default rule is that all unsecured claims should be treated in the same class. *In re 266 Washington Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992) ("It has accordingly been observed that 'unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor.'" (alteration and citations omitted)), *aff'd sub nom. In re Washington Assocs.*, 147 B.R. 827 (E.D.N.Y. 1992).

109.    While the Debtors owe no explanations for their decision to classify general unsecured claims together and not disparately treat some or others, the Debtors did not discern a valid business justification for separate classification of these claims. Chenault Decl. ¶ 10.

---

[7] Interestingly, litigation claims like those asserted by MSC are often separately classified in Chapter 11 plans from claims of other general unsecured claimants, like vendors and others that are valuable to a reorganized debtor's business. *See Mallinckrodt*, 639 B.R. 858 (noting separate classification of litigation claims); 7 Collier on Bankruptcy P 1122.03 (16th 2024) ("a number of courts have allowed separate classification for trade or other unsecured creditors with whom the debtor intends to continue to do business"). As discussed above, both vendors and equity holders are vital to the Debtors' business here, but the Debtors have not opted to attempt to separately classify and disparately treat MSC's claims, choosing instead to keep general unsecured claims classified together.

Moreover, it should not be overlooked that many of the equity holders holding general unsecured claims based on notes are also employees of the Debtors whose work will yield the disposable income that will fund distributions under the Plan. *Id.* Therefore, it would be imprudent to discriminate against noteholders in the Plan, even if it is possible to confirm the Plan under section 1191(b).

> **3.**    **The Plan's Treatment of Dr. Hassinger's Secured and Unsecured Claims, Dr. Hassinger's Status as a Consultation Party, and Disclosure of His Compensation for Service as Chief Executive Officer Do Not Render the Plan Unconfirmable**

110.    MSC takes issue with Dr. Hassinger's receipt of a salary for his role as Chief Executive Officer of the Debtors, as well as Dr. Hassinger's superiority administrative expense claim on account of the DIP loan. MSC Objection, ¶¶ 17, 22. Regarding the salary, MSC cites no reason why Dr. Hassinger should receive different compensation for his employment with the Debtors than the Plan proposes, which is consistent with his prepetition compensation. Chenault Decl. ¶ 29.m. Regarding the superpriority administrative expense claim, objections to the DIP financing were due on March 21, 2024, and MSC did not object to the DIP financing. A final order with respect to the DIP financing was entered on March 28, 2024, [Docket No. 100] and the deadline to appeal said order has expired.  Accordingly, MSC has waived the opportunity to object to Dr. Hassinger's receipt of a superpriority administrative expense claim.

111.    MSC asserts that "PAS and the other Debtors are controlled by Dr. Hassinger." MSC Obj. ¶ 25. This is not accurate. In recognition of the reality that Dr. Hassinger's position as DIP lender could give rise to conflicts in decision making regarding the Bankruptcy Cases, the Debtors authorized the Debtors' Chief Financial Officer, Colin Chenault, to make decisions in connection with the Bankruptcy Cases. The board resolutions for each Debtor, filed with the voluntary petitions, designate Mr. Chenault as the person responsible for bankruptcy decisions.

Accordingly, Mr. Chenault has been and continues to be the Debtors' representative and declarant in connection with matters before this Court. *See* Docket Nos. 17, 90, 127, 147, 204, 212-14.

112.    MSC asserts that Dr. Hassinger negotiated the Plan. This is not accurate. The Plan was developed by Mr. Chenault on behalf of the Debtors, in consultation with the Debtors' counsel, Dr. Hassinger as the DIP Lender, the Subchapter V Trustee, and the United States Trustee. The DIP Credit Agreement [Docket No. 18-1] required the Debtors to file a plan "acceptable to the DIP Lender" by May 21, 2024. DIP Credit Agreement, § 9(o), Ex. C. MSC cannot now complain that Dr. Hassinger has influence over the Plan when MSC failed to object to the motion seeking approval of the Debtors' entry into the DIP Credit Agreement.

### 4.    The Entire Fairness Standard is Inapplicable to the Plan

113.    MSC asserts that the Plan is "essentially" a transaction between the Debtors and their insiders, rendering it subject to review under the entire fairness standard. MSC Obj. ¶ 18. MSC relies on *In re Zenith Elecs. Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) to support its assertion that the Court must conduct entire fairness review. In *Zenith*, the Court evaluated a prepackaged plan that provided a single controlling shareholder 100% of the equity in the reorganized debtor in exchange for $200 million of debt and new funding of $60 million under the entire fairness standard as part of its consideration of the good faith requirement of section 1129(a)(3) of the Bankruptcy Code. The scenario in *Zenith* is akin to an acquisition by an insider with a combination of a credit bid and cash as consideration.

114.    As an initial matter, MSC alleges the Plan is a transaction between "the Debtor LLCs and insiders," but the entire fairness standard applies to transactions between a company and a controlling shareholder. *Zenith*, 241 B.R. at 108. MSC provides no support for application of the entire fairness standard to a transaction other than one between a company and a single controlling shareholder.

115.    Furthermore, the Plan and circumstances here are distinguishable from *Zenith*, such that *Zenith* in no way supports an entire fairness review of the Plan. First, there is no change of control under the Plan—the Debtors are reorganizing and equity holders will receive the same percentage interest they previously held in the Debtors.

116.    Second, in *Zenith*, the controlling shareholder owned a 57.7% stake of the debtor prior to the bankruptcy, rendering clear "controlling shareholder" status. *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 Del. Ch. LEXIS 102, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (emphasis omitted) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994)) ("Delaware courts will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'"). The test for whether a shareholder with less than a majority interest exercises "control" over a business is based on context, because Delaware courts consider "control" not to have a fixed legal meaning. *Id.* at *35. MSC has performed no analysis whether and for what purposes Dr. Hassinger, who owns 41% of the equity interest in the Debtors, is a controlling shareholder. Even if Dr. Hassinger is indeed a controlling shareholder, *Zenith* is not analogous to the facts here because Dr. Hassinger will not receive 100% of the equity in the Debtors under the Plan. Rather, he is receiving plan treatment that is authorized by the Bankruptcy Code. Thus, *Zenith*, which is not binding on this Court and has not been cited with approval for application of the entire fairness standard for a plan by any subsequent decision in this district, does not support application of the entire fairness standard to the Plan.

117.    Should the Court nonetheless determine to apply the entire fairness standard as part of its analysis of the good faith requirement, the Plan satisfies the fair dealing and fair price criteria.

*See Zenith*, 241 B.R. at 108. Regarding fair dealing, as set forth throughout this submission, the Plan was formed by Mr. Chenault in consultation Dr. Hassinger, the United States Trustee, and the Subchapter V Trustee. In addition to the Debtors have incorporated into the proposed confirmation order language resolving objections of certain claimants, the Debtors have also expressed to MSC and North Pointe their willingness to consider proposed changes to the Plan and the Plan's post-confirmation sale procedures. The proposed Plan treatment for all classes of claims conforms with the Bankruptcy Code.

118.    Regarding the price criterion, Delaware courts evaluate the price a reasonable buyer or seller would regard as fair or reasonable in light of the circumstances. *Tesla Motors, Inc.*, 2022 Del. Ch. LEXIS, at *70-71.[8] This factor is difficult to assess without a change of control transaction, like in *Zenith*. However, as the Bankruptcy Code contemplates that equity holders may retain their interests in a Subchapter V reorganization, there is nothing unfair about Dr. Hassinger receiving the same percentage interest in the reorganized Debtors as he previously held in the Debtors, like other equity holders. Dr. Hassinger's recoveries under the Plan are based on the nature of his claims under the DIP Credit Agreement and DIP Order, as well as notes held by Dr. Hassinger, and his treatment as both a DIP lender and general unsecured creditor are consistent with the Bankruptcy Code.

---

[8] MSC's fair price argument does not consider Delaware law regarding fair price for the purposes of an entire fairness analysis. Instead, MSC argues that the Court should disallow or subordinate certain insider claims to improve recoveries of non-insider creditors. Equitable subordination is addressed in Section V.A.5.a. of this Confirmation Brief.

**5. MSC's Attempt to Impose Equitable Subordination and Recharacterization to All Insider Claims Through an Objection Should Be Rejected**

119. MSC asserts that Dr. Hassinger's secured and unsecured claims and other insider unsecured claims should be subordinated. MSC Objection ¶¶ 26, 30, 37. A confirmation objection is not the appropriate mechanism to pursue equitable subordination or recharacterization. In any event, MSC does not meet the standards for either equitable subordination or recharacterization.

**a. Equitable Subordination**

120. Equitable subordination is a "drastic," "unusual," and "extraordinary" remedy "which is applied sparingly." *Official Comm. of Unsec. Creditors of HH Liquid., LLC v. Comvest Grp. Hldgs., LLC (In re HH Liquid., LLC)*, 590 B.R. 211, 298 (Bankr. D. Del. 2018). The elements for equitable subordination are: (1) inequitable conduct on the part of the claimant, (2) resulting injury to creditors of the bankrupt or an unfair advantage to the claimant, and (3) that equitable subordination not be inconsistent with the Bankruptcy Code. *HH Liquid.,* 590 B.R. at 298.

121. As an initial matter, MSC's request for equitable subordination as part of a confirmation objection is procedurally improper. A claim for equitable subordination requires the commencement of an adversary proceeding. *See* Fed. R. Bankr. P. 7001(8) ("The following are adversary proceedings: . . . (8) a proceeding to subordinate any allowed claim or interest, except when a . . . chapter 11 . . . plan provides for subordination"); *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230, 234 (3d Cir. 2008) ("Federal Rule of Bankruptcy Procedure 7001 sets forth matters that may only be resolved through an 'adversary proceeding.'"). More importantly, MSC—who has had notice of insider claims, including for the DIP financing, from the inception of these Bankruptcy Cases—has waited until the last possible moment in these Bankruptcy Cases, the eve of confirmation, to raise these issues. The DIP financing has been in place throughout the Bankruptcy Cases. The Debtors have already developed, solicited, and

41

obtained creditor approval for their Plan. To change the distribution structure now would require the Debtors to develop and solicit a different plan that risks not being accepted by the employee equity holders upon whom the Debtors rely to generate value to pay creditors, via projected disposable income, sale proceeds, or both. Even if such a plan was accepted by equity holders holding notes or confirmed via cramdown, loss of the rejecting minority as employees would be destructive to the Debtors' business.

122.    Even if timing was appropriate, MSC cannot meet applicable standards for this extreme relief. A claim for equitable subordination requires that movant demonstrate that the holder of a claim to be subordinated "is guilty of some misconduct." 4 *Collier on Bankruptcy* P 510.05. "Insider status alone" does not warrant subordination. *HH Liquid.*, 590 B.R. at 298. Similarly, undercapitalization alone does not warrant subordination. *Id.* (citing *In re Autostyle Plastics, Inc.*, 269 F.3d 726, 747 (6th Cir. 2001) ("This makes sense, as '[a]ny other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company.'")).

123.    MSC has lumped all insiders together in its request for equitable subordination. MSC Obj. ¶ 37. Yet, MSC has submitted as evidence of alleged misconduct only an affidavit regarding alleged conduct by Dr. Hassinger, which echoes MSC's complaint in contested state-court litigation. Those allegations relate only to dealings between MSC and PAS and are disputed by PAS. *See* PAS Services PLLC Schedule E/F at 1 [Docket No. 107]; *see also* Pioneer Health Systems LLC Amended Schedule E/F at 6 [Docket No. 165]; DOC LLC Amended Schedule E/F at 15 [Docket No. 167]. The allegations do not relate to an injury to all creditors or any unfair advantage to Dr. Hassinger or any other insiders. MSC's assertion that "it appears" the intent of

42

the notes was to "purposefully undercapitalize" the Debtors is unsupported altogether. Thus, MSC has submitted no evidence that supports a finding that insiders have engaged in inequitable conduct warranting equitable subordination.

### b.    Recharacterization

124.    MSC asks the Court to force the Debtors to recharacterize noteholder claims without actually moving for or attempting to fulfill the burden associated with recharacterizing those claims. MSC Obj. ¶ 34. The Court should disregard MSC's offhand suggestion of recharacterization, which bears the same timing and practicality deficiencies as MSC's request for equitable subordination. Even if MSC properly and timely sought recharacterization, the remedy is not appropriate here.

125.    Recharacterization is a remedy distinct from equitable subordination and involves determination by the Court as to the "proper characterization in the first instance of an investment." *Cohen v. KB Mezzanine Fund II, LP, (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d. Cir. 2006). In assessing whether the true nature of an investment is equity or debt, courts look to the intent of the parties, form of the instrument, and economic reality of the transaction. *Id.* at 456. Factors that assist in the evaluation of intent include, among others: (i) the name of the instrument; (ii) the presence or absence of a fixed maturity date or interest rate; (iii) the source of repayments; (iv) the adequacy or inadequacy of capitalization; (v) the corporation's ability to obtain financing from outside lending institutions on similar terms; (vi) the extent to which the proceeds were used to acquire capital assets; and (vii) the presence or absence of a sinking fund. *Autostyle*, 269 F.3d at 749-50.

126.    The notes, including the convertible promissory note attached to MSC's Objection, are called "notes." Chenault Decl. ¶ 10. They have maturity dates and interest rates. *Id.* The notes contain provisions disclaiming that they confer voting or distribution rights. *Id.* They also contain

43

agreements to subordinate to the rights of any bank or commercial lender that agrees to lend money to Pioneer Health Systems LLC. *Id.* The proceeds from the notes have been used for the Debtors' operations. *Id.* Obtaining loans from traditional lenders is and has always been difficult for the Debtors, as they have no hard assets to serve as collateral. *Id.* The Debtors have reported their assets throughout these Bankruptcy Cases, and it is clear from the schedules and monthly operating reports that there is no sinking fund being used or that could be used to repay noteholders; rather many of the notes are in default. *Id.*

### 6.    Oversight Process for Analysis of Insider Claims

127.    Finally, MSC demands that an independent third party review the claims of insiders. While the Debtors have invited proposals from MSC for what specific process it envisioned on this point, MSC has not yet articulated what it specifically wants. More importantly, however, MSC has not articulated on what basis—other than its ill-fated arguments concerning equitable subordination or reclassification—the Debtors might have for objecting to the claims of insiders. For many of the claims, the holder did not file a proof of claim as the claims were not marked as disputed, contingent, or unliquidated on the Debtors' schedules. For those insiders who filed proofs of claim, those claims will be analyzed and reviewed in due course as part of the claims allowance process.

### B.    Objection of North Pointe Ventures, LLC to the Debtors' Amended Subchapter V Plan of Reorganization [Docket No. 219]

128.    North Pointe is a party-in-interest that proposed to acquire the Debtors' equity and became a creditor by virtue of a $6,750.00 claim purchased on May 31, 2024. *Transfer of Claim Other than For Security* [Docket No. 202]. North Pointe's objection focuses on promoting its equity purchase offer—an offer it has held out to fellow creditors as an alternative plan in an email campaign. North Pointe accuses the Debtors of failing to satisfy the good faith and best interests

44

requirements to confirm a plan under section 1129(a)(3) and (7) of the Bankruptcy Code because the Debtors have declined to sell their equity to North Pointe in a private sale effected by the Plan.

129.    The Debtors' satisfaction of the requirements of sections 1129(a)(3) and (7) of the Bankruptcy Code are set forth in sections III.C and III.G of this Confirmation Brief. A late and improperly-asserted challenge to the Debtors' Subchapter V election lodged in North Pointe's objection is addressed in section V.C. of this Confirmation Brief. The Debtors will address here: (1) North Pointe's contention that the Debtors' decision not to liquidate during these Bankruptcy Cases amounts to a lack of good faith that bars confirmation of the Plan, North Pointe Obj. ¶ 5; (2) assertions North Pointe makes regarding value it could attribute in a hypothetical Chapter 7 sale process; and (3) North Pointe's efforts to persuade creditors to vote in favor of North Pointe's proposals by rejecting the Plan the Debtors proposed.

### 1. The Debtors Are Not Bound to Conduct a Sale Process During the Bankruptcy Cases

130.    Section 363 of the Bankruptcy Code provides that a trustee or debtor in possession *may* sell property of the estate other than in the ordinary course of business, after notice and a hearing. 11 U.S.C. § 363. Thus, the Bankruptcy Code permits but does not require sales of property, and it is not a given that a debtor will obtain authorization to conduct a 363 sale. Bankruptcy courts impose certain requirements to prevent section 363 sales from "circumventing the protections afforded creditors under Chapter 11." *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997). Bankruptcy courts apply the "sound business purpose" test, which calls for consideration of a variety of factors and evaluates business judgment relating to a proposed transaction. *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Hldg. Corp. (In re Montgomery Ward Hldg. Corp.)*, 242 B.R. 147, 153 (D. Del. 1999). Factors courts consider may include and are not limited to:

. . . proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value.

*Id.* at 153-54 (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

131.    The Debtors are not required to run a 363-sale process during these Bankruptcy Cases and could not propose one in good faith for several reasons. First, and most practically, the Debtors lack liquidity to remain in Chapter 11 much longer. The Debtors have been cognizant of their cash needs throughout these Bankruptcy Cases and have timed confirmation of the Plan to permit them to access additional working capital through exit financing. Chenault Decl ¶ 19. Currently, the Debtors project the need to draw on exit financing as early as August 12, 2024. *Id.* at ¶21. The DIP budget [Docket No. 100-2] was never designed to accommodate a 363-sale process. The 13-week budget supported the Debtors' goal from day 1 to shed unprofitable leases, streamline payments to creditors, and reorganize with a focus on profitability. First Day Declaration, ¶ 22. The Plan is consistent with the course the Debtors set out for these Bankruptcy Cases.

132.    Second, and relatedly, the Debtors' inability to fund a 363 process means they are not able to market a 363 sale in a manner that obtains the highest and best value for stakeholders. The Debtors believe changes implemented during these Bankruptcy Cases, namely shedding unprofitable leases and improving operations at remaining locations will continue to increase their value post-confirmation.[9] Chenault Decl. ¶ 18. The Debtors received offers from two parties

---

[9] This weighs against proceeding with a 363 sale under the last of the "sound business purpose" factors enumerated above.

during these Bankruptcy Cases and recently received an indication of interest from a third party. Chenault Decl. ¶¶ 19, 23. The Debtors consider it more consistent with their fiduciary duties to run a marketing process that offers creditors upside, as proposed in the Plan, rather than propose a private sale in the Plan—presumably with North Pointe—without the benefit of a market test, as North Pointe and MSC wish. Hence, the Debtors view the proposal of a plan with a private sale, in the circumstances here, as counter to section 1129(a)(3)'s good faith requirement.

### 2.    North Pointe's Misleading Chapter 7 Musings

133.    North Pointe asserts that "if the Chapter 11 Cases were converted to Chapter 7, North Pointe is still willing to work with a Chapter 7 trustee to provide funding to maintain the Debtors' operations and to acquire substantially all of the Debtors' assets for $10 million." North Pointe Obj. ¶ 9. This offhand assertion and the unsubstantiated promises of creditor recoveries that follow are dangerous considering North Pointe's communications to creditors instructing that they could support North Pointe's "alternative" to the Plan by joining North Pointe's objection to the Plan and voting against the Plan, which is discussed further below.

134.    North Pointe provides no explanation for why these Bankruptcy Cases would conceivably convert to Chapter 7. North Pointe provides no evidence to substantiate its promises of funding or a transaction. North Pointe makes no mention of the fact that the Debtors requested that North Pointe propose a means of financing a sale process within these Bankruptcy Cases, and North Pointe never made a financing proposal. Moreover, the unknowable state of the Debtors' estates at the time of any hypothetical conversion and lack of predictability of how a Chapter 7 trustee would choose to administer a Chapter 7 estate of a medical practice 1,400 miles away make it inconceivable that North Pointe is as bound as it represents to proceed with a sale transaction. North Pointe disclaims that it would participate in a post-confirmation sale process of a going concern for the very same equity or assets.

47

135.     North Pointe's hollow promises and careless assertions risked destroying the progress the Debtors have made toward confirming their Plan, and the Debtors are grateful to have won the support necessary to proceed with a consensual confirmation. At this stage, the Court should not be persuaded by and should disregard North Pointe's assertions that the Plan fails the best interests test of section 1129(a)(7) based on a Chapter 7 liquidation scenario involving North Pointe.

### 3. North Pointe's Efforts to Undermine the Debtors' Exclusive Right to Propose a Plan

136.     On June 17, 2024, North Pointe embarked on a campaign to promote its vision for a plan over the plan proposed by the Debtors. An individual named Michael Scott, holding himself out as a representative of North Pointe, emailed no less than 10 individuals believed to be creditors asking for their support for an "improved alternative." A copy of that correspondence is <u>Exhibit A</u> to the *Declaration of Alessandra Glorioso in Support of Brief in Support of Confirmation of Debtors' Second Amended Subchapter V Plan of Reorganization* filed contemporaneously herewith (the "<u>Glorioso Decl.</u>").  Mr. Scott's email contains: a purported summary of creditor treatment under the Debtors' First Amended Plan; a summary of North Pointe's view of its offer and unsecured creditor recoveries if a plan incorporated the terms of North Pointe's offer; and the following statements and requests:

> . . . we thought it important that creditors understand that our offer is still in place and could be beneficial to creditors if acted on. Because the Debtors have exclusive rights to file a plan, there are some procedures that must take place to allow our offer to get proper consideration. The next step procedurally will be for our investor group to object to the plan of reorganization and demonstrate to the Court that the Debtors are not acting in the best interest of creditors. Our hope would be that the Court would not approve their plan as filed and the Debtors would then be compelled to put forward our better offer.
>
> **<u>What we would ask from you?</u>**

If you would like to provide your support for this improved alternative, you may consider the following:

Joining in our objection to the plan of reorganization. We can provide you a draft of our objection prior to the objection deadline, and you can file a short statement in support of the objection with the bankruptcy court on or before June 28, 2024. Please respond to this email if you would like to receive a draft of the objection.

Reaching out to the Debtors to ask them to consider the offer that is on the table rather than going forward with the plan they have on file.

Vote to reject the plan as currently proposed by the Debtors.

Ex. A to the Glorioso Decl.

137.     Though North Pointe may have taken some measures to toe the line on whether its correspondence qualifies as a solicitation of a competing plan, one recipient of this correspondence referred to "your purchase plan" in a response, and another stakeholder reaching out to North Pointe referred to "your plan." North Pointe did not correct or disclaim these statements in replies. Exs. B & C to the Glorioso Decl. At least one recipient of North Pointe's email voted to reject the Plan.

138.     Again, the Debtors are pleased to have received votes necessary to proceed to a consensual confirmation of their Plan. The Debtors are relieved that there is no need to expend resources investigating or remediating the damage caused by North Pointe's efforts to interfere with the Debtors' solicitation of their Plan. The Debtors provide the foregoing information and related Exhibits in the interest of disclosure to the Court and to all stakeholders, as well as for the Court's benefit to fully evaluate North Pointe's objection and objectives.

C.     **MSC and North Pointe Are Time Barred from Objecting to the Debtors' Subchapter V Elections**

139.     Neither MSC nor North Pointe has timely or properly raised an objection to the Debtors' elections for Subchapter V. Federal Rule of Bankruptcy Procedure 1020(b) sets the time

4890-1912-1362\9

for a party in interest to object to a debtor's election to proceed under Subchapter V as "(a) no later than 30 days after the conclusion of the meeting of creditors held under § 341(a) of the Code, or within 30 days after any amendment to the statement, whichever is later." Fed. R. Bankr. P. 1020(b). The U.S. Trustee filed a minute sheet regarding the conclusion of the meeting of creditors on May 28, 2024 [Docket No. 183]. The Debtors did not subsequently amend their statement electing to proceed under Subchapter V. Therefore, the deadline to object to the elections was June 27, 2024, the day prior to both MSC's and Northpoint's objections.

140.    Even if MSC and North Pointe timely raised disputes regarding the Debtors' Subchapter V elections, the medium of a confirmation objection is improper; any objection is governed by Rule 9014 and should be raised in a motion. Fed. R. Bankr. P. 1020(c). What's more, the Debtors were eligible for relief under Subchapter V because, after deducting for claims of insiders and contingent or unliquidated claims, as of the Petition Date, the Debtors' total debts were less than $7.5 million.

**D.      Limited Objection and Reservation of Rights to the Amended Subchapter V Plan of Reorganization of Paul C. Dougherty and PCD Building Company [Docket No. 217]**

141.    Paul C. Dougherty is a former employee of the Debtors, and his construction company, PCD Building Company ("PCD"), was the general contractor responsible for building the Debtors' tenant improvements at various clinic sites. The Debtors dispute liability as to the entirety of the claims asserted by Dougherty and PCD and have objected to the claims asserted by Dougherty and PCD.

142.    First, PCD reserves its rights with respect to the treatment of PCD's claim in Class 1(k) of the Plan, which provides for mechanics' liens claims to be treated as general unsecured claims. Notably, Class 1(k) accepted the Plan and its proposed treatment of the claims. In any event, the proposed treatment of PCD's claim is appropriate.

143.    All Class 1(k) claims arise from mechanics' liens against DOC LLC's interest in the real property commonly known as 729 East Slaughter Lane, Suite 404, Austin, Texas (the "Subject Property"). DOC does not own the Subject Property; rather DOC's interest in the Subject Property is limited to a leasehold. Thus, as to the Debtors, Class 1(k) claims merely attach to a leasehold interest.

144.    The Debtors' position is that the lease has no value above their current use of the Subject Property. The Debtors only took possession of the Subject Property in December 2023. If the Debtors were to attempt to assign the lease, the Debtors do not believe they could extract any value from the assignment. Obviously, if the Debtors stopped paying rent or otherwise breached the lease with the landlord, there is significant risk that the lease interest would be terminated entirely. And it is axiomatic that Debtors have no equity in the Subject Property to which the mechanics' liens may attach. Hence, pursuant to section 506(a) of the Bankruptcy Code, claims in Class 1(k) are appropriately bifurcated into their secured and unsecured amounts, with holders of Class 1(k) claim each holding allowed secured claims of $0, and an unsecured claim for the remaining amount of their claims.  In any event, the parties have agreed to delay resolution of PCD's objection pursuant to the reservation of rights, and the and the Court need not resolve valuation and treatment issues now.

145.    The Debtors acknowledge Dougherty's reservation of rights with respect to allowance of his asserted Class 2 claim. The Plan provides for payment of Class 2 claims in full on the Effective Date, or such later date that these claims become allowed. This proposed treatment complies with the Bankruptcy Code. The parties have agreed to delay resolution of Dougherty's objection pursuant to the reservation of rights.

4890-1912-1362\9

## VI.    Cause Exists to Waive the Stay of the Confirmation Order

146.    The Debtors request that the Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).

147.    As described in the Chenault Declaration, the Plan has been extensively negotiated in good faith by the Debtors, the DIP Lender, the Subchapter V Trustee, and the United States Trustee. Additionally, each day the Debtors remain in Chapter 11, they incur significant administrative and professional costs. Finally, staying effectiveness of the Confirmation Order is unlikely to serve any due process-related ends because the Debtors' Plan has been fairly solicited, parties have had ample notice of these proceedings and the ability to participate in them, and the Plan is consensual with broad creditor support. Accordingly, the requested waiver of the stay will allow the Debtors to finalize the processes required for their reorganization in a timely manner, and in advance of their projected need to access the Exit Facility, and will reduce disruption and incremental costs to the Debtors' business caused by these Bankruptcy Cases, and is therefore in the best interests of the Debtors' estates and creditors and will not prejudice any parties in interest. Good cause thus exists for the Court to exercise its discretion and waive any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately.

4890-1912-1362\9

## CONCLUSION

WHEREFORE, the Debtors respectfully request the Court enter the proposed Confirmation Order, confirming the Plan, overrule any remaining objections to confirmation of the Plan, waive the stay of enforcement of the Confirmation Order, and such other and further relief as the Court may deem just and proper.

Dated: July 22, 2024
Wilmington, Delaware

**DORSEY & WHITNEY (DELAWARE) LLP**

*/s/ Alessandra Glorioso*
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Email: glorioso.alessandra@dorsey.com

-and-

**DORSEY & WHITNEY LLP**
Matthew Olson (*pro hac vice*)
167 Hamilton Avenue, Suite 200
Palo Alto, CA 94301
Telephone: (650) 857-1717
Email: olson.matt@dorsey.com

*Counsel for the Debtors and Debtors in Possession*