IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PIONEER HEALTH SYSTEMS LLC, *et al.*,[1]<br><br>Debtors. | Case No. 24-10279 (JKS)<br><br>Chapter 11 (Subchapter V)<br><br>(Jointly Administered) |

### DECLARATION OF COLIN CHENAULT IN SUPPORT OF CONFIRMATION OF DEBTORS' SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

I, Colin Chenault, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Financial Officer of DOC Corporate Group LLC located at 3300 Dallas Parkway, Suite 200, Plano, TX 75093.

2. I make this declaration in support of confirmation of the *Debtors' Second Amended Subchapter Plan of Reorganization* [Docket No 230] (as may be further modified, amended or supplemented from time to time, the "Plan").[2]

3. I am over the age of 18 and authorized to submit this declaration on the Debtors' behalf, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4. I am familiar with the information in the Plan and the *Brief in Support of Confirmation of the Debtors' Second Amended Subchapter V Plan of Reorganization* (the "Confirmation Brief") filed concurrently with this declaration. I have reviewed the Plan and the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows: Pioneer Health Systems LLC (4107), DOC LLC (0729), DOCTX3 PLLC (2604), PAS Services PLLC (8928), and DOC Corporate Group LLC (0970). The address of the Debtors' corporate headquarters is 3300 Dallas Pkwy, Suite 200, Plano, TX 75093.

[2] Capitalized terms used herein but not otherwise defined shall have the meanicngs ascribed to them in the Plan.

4866-2843-9506\9

Confirmation Brief. I have become familiar with the applicable requirements set forth under Bankruptcy Code sections 1190, 1191, and 1129.

## BACKGROUND

5. On February 21, 2024 (the "Petition Date"), the Debtors commenced these cases (the "Bankruptcy Cases") by filing voluntary petitions under chapter 11 of the Bankruptcy Code. Each Debtor elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Reorganization Act of 2019 (Public Law 116-54), as amended.

6. On February 22, 2024, Mr. David M. Klauder was appointed as the Subchapter V Trustee (the "Subchapter V Trustee"). No other trustee, examiner, or official committee has been appointed in this case. The Debtors are operating their business as debtors in possession pursuant to section 1182(2) of the Bankruptcy Code.

7. The Debtors operate and manage full-service orthopedic clinics in Texas and, prior to the petition date, also operated in Oklahoma and California. The Debtors currently have approximately 167 full-time employees, 47 part-time employees, and six contractors. The Debtors' clinics provide orthopedic-specific urgent care at 10 clinic locations, all but two of which are currently open seven days a week for both walk-in patients and those with an appointment. The Debtors also provide pain management, physical therapy, and regenerative medicine services through their network of clinics. The Debtors' surgeons consult with patients in the Debtors' clinics, but surgeries are performed at local hospitals or surgery centers. Additionally, the Debtors provide patients located within Texas with TeleHealth options for obtaining care and evaluations through live video conferencing.

8. As detailed in my First Day Declaration, the Debtors' operations have long been underfunded. While prioritizing growth, profitability was hampered, resulting in multiple additional rounds of debt financing without a clear path to servicing the additional debt. The

Debtors were fast to expand and slow to exit unprofitable locations and markets. As a result, over time, the Debtors were unable to timely service their debt obligations to noteholders and recurring obligations to trade creditors and landlords.

9. As detailed in the Declaration of Colin Chenault in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 17] (the "First Day Declaration"), the Debtors' prepetition capital structure included secured debt and unsecured debt in the amount of approximately $12,035,941.98, including pursuant to notes. A total of approximately $9,755,972.00 of this debt was owed to various insiders, who held debt pursuant to notes, convertible notes, or both. The total of debt owed to insiders on account of convertible notes is approximately $2,831,288.01.

10. Many of the insiders holding debt pursuant to notes are employees of the Debtors. Obtaining loans from traditional lenders is and has always been difficult for the Debtors, as they have no hard assets to serve as collateral. Therefore, insiders of the Debtors, including employees and members of management, have lent funds to the Debtors. The proceeds of these notes were used by the Debtors to fund their operations. Several notes were in default at the time of the Petition Date, and several more were scheduled to become due within 2024, such that over half of the notes would be in default by the end of the year. The Debtors had no foreseeably available funds to repay the matured and maturing notes. Additionally, these insider notes (i) arise from an instrument entitled a promissory note, (ii) require payment of regular interest, (iii) have a defined maturity date, and (iv) have other indicia of a debt instrument. The notes contain provisions disclaiming that they confer voting or distribution rights. They also contain agreements to subordinate to the rights of any bank or commercial lender that agrees to lend money to Pioneer Health Systems LLC. Many of these obligations were already in or were about

to be in default, and as they had the hallmarks of debt obligations, the Debtors determined that it was not appropriate to separately classify these claims in their Plan.

11. Although certain of the notes included provisions which permitted the lender or the Debtors to convert the indebtedness to equity (the "Convertible Notes"), the mechanics of the conversion and its reliance on the Debtors' prior year EBITDA would have resulted in massive equity awards to any lender whose Convertible Note was converted to equity. As the identity of holders of Convertible Notes and the percentage of their investments in Convertible Notes does not match the identity of Debtors' equity interest holders and their relative interests in the Debtors' equity, the Debtors determined that it was not in the Debtors' best interests to exercise the conversion right.

12. The Debtors determined that it was in the best interest of the Debtors and their constituents to file this bankruptcy proceeding, invoke the automatic stay, obtain breathing space from their creditors and various pending lawsuits, focus on rejecting unprofitable leases for closed or never-opened locations, reduce debt burden, and place more emphasis on profitability and positive cash flow in order to successfully emerge from bankruptcy as a viable business. The Debtors expected to move, and have moved, swiftly to the Chapter 11 plan process.

13. Shortly after the Petition Date, the Debtors took numerous steps to implement their restructuring. The Debtors filed various motions seeking first-day relief, as more particularly described in section 1.9 of the Plan, including a the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") [Docket No. 18] to provide necessary short-term

liquidity for the Debtors' operations. The Court entered an order approving the relief requested in the DIP Motion on March 28, 2024 (the "Final DIP Order") [Docket No. 100].

14. Thereafter, the Debtors filed their Motion of Debtors for Entry of an Order Authorizing (I) Rejection of Certain Unexpired Leases of Nonresidential Real Property and (II) Abandonment of Any Remaining Property Located at Leased Premises (the "Lease Rejection Motion") [Docket No. 62] to reject various leases for real property that were burdensome to their estates. On March 28, 2024, the Court entered an order granting the Lease Rejection Motion and approved rejection of the leases mentioned therein effective as of the Petition Date (the "Lease Rejection Order") [Docket No. 101].

15. The Debtors also filed their *Motion of Debtors for Entry of an Order Authorizing Assumption of Certain Unexpired Lease of Nonresidential Real Property* (the "Lease Assumption Motion") [Docket No. 89] which sought assumption of those leases related to the locations which the Debtors intended to continue using for their operations. The Court approved the Lease Assumption Motion by order entered on April 16, 2024 (the "Lease Assumption Order") [Docket No. 140].

16. Among the leases assumed by the Debtors was the lease for the real property commonly known as 729 East Slaughter Lane, Suite 404, Austin, Texas (the "Subject Property"). DOC does not own the Subject Property; rather DOC's interest in the Subject Property is limited to a leasehold. The Debtors only took possession of the Subject Property in December 2023. If the Debtors were to attempt to assign the lease, the Debtors do not believe they could extract any value from the assignment. Based on my experience, but for the Bankruptcy Cases, if the Debtors stopped paying rent or otherwise breached the lease with the landlord, there is significant risk that the lease interest would be terminated entirely by the landlord. In my

opinion, the lease has no value above their current use of the Subject Property and there is no value in the lease to which a secured claim based on a mechanics' lien could attach.

### THE PLAN AND EXPRESSIONS OF INTEREST

17. On May 21, 2024, the Debtors proposed their *Subchapter V Plan of Reorganization* (as it may be amended or supplemented, the "First Plan") [Docket No. 181] which they amended on May 31, 2024, to address various comments they received. The Debtors *Amended Subchapter V Plan of Reorganization* (the "First Amended Plan") [Docket No. 185] was distributed to creditors for solicitation.

18. The Debtors believed from the outset of these Bankruptcy Cases that the changes implemented during these Bankruptcy Cases, namely shedding unprofitable leases and improving operations at remaining locations, will continue to increase their value post-confirmation.

19. After filing of the First Plan, the Debtors received expressions of interest in purchasing the Debtors or their assets from two parties, including North Pointe Ventures, LLC ("North Pointe"). Given the expressions of interests, and the Debtors' desire to obtain the highest and best value for any sale transaction, the Debtors began evaluating a marketing process to market test the value of their business, but keeping in mind the Debtors' need to emerge with a confirmed plan by August 2024 to be able to access exit financing for the additional liquidity needed for their operations to continue.

20. The Debtors concluded that it was not possible to conclude a marketing and sale process designed to maximize value of their estates, within the Bankruptcy Cases, in light of the Debtors' liquidity needs and limited DIP financing of up to $700,000.

21. On or about June 17, 2024, I became aware of a campaign by North Pointe to promote its vision for a plan over the plan proposed by the Debtors. When that campaign

persisted into July, the Debtors made informal discovery requests of North Pointe concerning its campaign. I have reviewed those communications produced by North Pointe and the voting reports provide by the Voting Agent. At least one recipient of North Pointe's communications voted to reject the Plan.

22. The Debtors were able to negotiate exit financing conditioned on confirmation of a plan of reorganization. The agreements related to the exit financing are attached to an amended Plan Supplement filed concurrently herewith. The agreements described a $450,000 term loan (the "Term Loan") which the Debtors will use to retire the DIP Loan, and a $700,000 revolving line of credit (the "Line of Credit") which the Debtors will use to meet their intramonth liquidity needs. Combined, the Term Loan and the Line of Credit provide the Debtors with the liquidity they need to operate and retire the outstanding balance on the DIP Loan. The terms of the Term Loan and the Line of Credit are materially better for the Debtors, in that the interest rate and fee structure are more favorable to the Debtors and the Debtors may prepay both the Term Loan and the Line of Credit without penalty. The Term Loan is offered by TFGH Ventures LLC, a party unrelated to the Debtors. The Line of Credit is offered by Bonito Kitty, LLC, an entity controlled by Dr. Hassinger. The Debtors need to access to the exit financing as early as August 12, 2024.

23. Ultimately, after consultation with the U.S. Trustee and the Subchapter V Trustee, the Debtors filed their *Second Amended Subchapter V Plan of Reorganization* (the "Second Amended Plan") [Docket No. 230] on July 5, 2024. The Second Amended Plan included a new Exhibit I, setting forth proposed sale procedures (first disclosed in the *Plan Supplement* [Docket No. 215]) for a post-confirmation sale process. The Debtors agreed to requests by the U.S. Trustee and the Subchapter V Trustee to provide creditors who voted on the plan an opportunity to change their votes on confirmation, and to allow all creditors to object to the revisions made by the Second Amended Plan.

24. During the week of July 15, 2024, the Debtors received a third expression of interest, supporting the Debtors' belief that the restructuring effected during these Bankruptcy Cases has improved and will continue to improve the Debtors' value, and that a marketing process is necessary to obtain the highest and best value for the Debtors' assets or equity.

25. I am aware that the Debtors received informal comments from various creditors, agreed to include language in the confirmation order to resolve these informal comments, and that the Debtors received four formal objections to confirmation of their Plan:

    a. The *Limited Objection and Reservation of Rights* by Paul C. Dougherty and PCD Building Company [Docket No. 217]. The Debtors have objected to the claims filed by Paul C. Dougherty and PCD Building Company and the parties have agreed to resolve the objection to these claims following confirmation of the Plan.

    b. The *Objection of Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare to Amended Subchapter V Plan of Reorganization* by Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare (collectively, "MSC") [Docket No. 218]. The Debtors have been conferring with MSC regarding the consensual resolution of their objection, but have not been able to resolve the objection.

    c. The *Objection to the Debtors' Amended Subchapter V Plan of Reorganization* by North Pointe Ventures, LLC [Docket No. 219], which purchased a claim in these cases to become a party in interest. The Debtors have been conferring with North Pointe regarding the consensual resolution of their objection, but have not been able to resolve the objection.

d. The *Objection to Confirmation of Plan* filed by Collin County Tax Assessor/Collector [Docket No. 220]. The Debtors and the Collin County Tax Assessor/Collector reached a consensual resolution of the objection, which the Debtors will include in the order confirming the Plan.

26. The Debtors have had continuing conversations with MSC and North Pointe regarding their objections to confirmation of the Second Amended Plan but have not yet been able to resolve those objections consensually.

27. The Debtors have worked productively throughout this proceeding with the U.S. Trustee, the Subchapter V Trustee, and significant creditors. I understand that, despite obtaining the necessary votes to obtain consensual confirmation under section 1191(a) of the Bankruptcy Code, there are unresolved objections to confirmation of the Plan. The Debtors are nevertheless seeking consensual confirmation of the Plan.

28. Confirmation of the Plan represents the best avenue for the Debtors to maximize the value of their business.

## COMPLIANCE WITH BANKRUPTCY CODE REQUIREMENTS FOR CONFIRMATION

29. I believe that the Plan complies with the applicable provisions of the Bankruptcy Code including, but not limited to, the following:

a. *Proper Classification (Sections 1122 and 1123(a)(1) of the Bankruptcy Code)*: The Plan contains 21 separate classes of claims and interests, with each Class containing substantially similar claims or interests as required by section 1122—13 classes of secured claims (Classes 1(a)-1(m)), Priority Wage Claims (Class 2), an 1122(b) convenience class for small claims (Class 3), and General Unsecured Claims (Class 4), and five classes of Equity Interests (Classes 5(a)-5(e)). Each of the classes are dissimilar and each claim in a particular Class is substantially similar to the other claims in that class. I am familiar with the classification of claims and equity interests and believe it is based on the legal nature and relative rights of each of the claims and equity interests and is not proposed for any improper purpose.

b. *Specified Treatment of Unimpaired Claims (Section 1123(a)(2) of the Bankruptcy Code)*: The Plan specifies whether each Class of claims and Equity Interests is unimpaired under the Plan and sets forth the treatment of such classes of claims and Equity Interests.

c. *Specified Treatment of Impaired Classes (Section 1123(a)(3) of the Bankruptcy Code)*: The Plan specifies whether each class of claims and Equity Interests is impaired under the Plan and sets for the treatment of such Classes of claims and Equity Interests.

d. *No Discrimination (Section 1123(a)(4) of the Bankruptcy Code)*: The Plan provides for each claim or interest that is classified in a particular Class under the Plan will receive the same treatment as the other claims and interests included in such Class.

e. *Implementation of the Plan (Section 1123(a)(5) of the Bankruptcy Code)*: The Plan provides for adequate and proper means of implementation. The Debtors will be funded by the proceeds realized from the operations of the Debtors or, in the event of a sale of the Debtors or their assets, from the proceeds of that sale. The Exit Facility described in the Amended Plan Supplement will provide adequate liquidity for the Debtors' operations.

f. *Nonvoting Equity Securities (Section 1123(a)(6) of the Bankruptcy Code)*: The Plan does not provide for issuance of non-voting equity securities.

g. *Continuation of Existing Corporate Officers (Section 1123(a)(7) of the Bankruptcy Code)*: Holders of Equity Interests will maintain their existing Equity Interests as they existed on the Petition Date and applicable nonbankruptcy law. The Debtors' current CEO/Managing Member, Chief Clinical Officer, Chief Financial Officer, and Chief Operating Officer shall remain with the Reorganized Debtors after the Effective Date, pursuant to Section 2.7 of the Plan.

h. *Future Income of Individuals (Section 1123(a)(8) of the Bankruptcy Code)*: I understand this provision of the Bankruptcy Code is inapplicable because the Debtors are limited liability companies and professional limited liability companies.

i. *Releases and Exculpation (Sections 1123(b)(1)-(4) and (6) of the Bankruptcy Code)*: The Plan contains releases by the Debtors, as well as exculpation provisions. These provisions were integral to the negotiation of the Plan. The Released Parties and Exculpated Parties participated in good faith with respect to the Debtor's restructuring efforts, the Chapter 11 Case, and formulating and negotiating the Plan. Each of the Released Parties made contributions to the Bankruptcy Cases or will do so as a means to implement the Plan and did or will do so with the understanding that they would receive releases from the Debtors. Without the Released Parties' support, the Debtors would not be in a position to confirm the Plan. I believe the Debtor Releases are a valid exercise of the Debtors' business judgment. The Exculpation Provision is limited to estate fiduciaries and includes the carve out for gross negligence and willful misconduct

that I understand is consistent with established practice in this jurisdiction. Based on my knowledge of the negotiations, these provisions are fair and reasonable, and necessary to the realization of a successful confirmation.

j. *Compliance with the Bankruptcy Code (Section 1129(a)(2) of the Bankruptcy Code)*: To the best of my knowledge, the Debtors have complied with the Bankruptcy Code in proposing the Plan and in commencing and conducting Plan solicitation.

k. *Plan Proposed in Good Faith (Section 1129(a)(3) of the Bankruptcy Code)*: To the best of my knowledge, the Debtors have proposed the Plan in good faith and not by any means forbidden by law. The Debtors, as proponents of the Plan, have acted in good faith in the negotiation and formulation of the Plan.

l. *Payments for Services or Costs and Expenses (Section 1129(a)(4) of the Bankruptcy Code)*: To the best of my knowledge, any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with these cases, outside the ordinary course of business, is subject to the approval of, the Court.

m. *Directors, Officers, and Insiders (Section 1129(a)(5) of the Bankruptcy Code)*: Section 2.7 of the Plan states that Debtors' current CEO/Managing Member, Chief Clinical Officer, Chief Financial Officer, and Chief Operating Officer shall remain to serve the Reorganized Debtors after the Effective Date, identifies each of these officers by name, and describes their annual compensation. The annual compensation of each officer is the same as their prepetition compensation.

n. *No Rate Changes (Section 1129(a)(6) of the Bankruptcy Code)*: The Plan does not propose any rate changes subject to the jurisdiction of any governmental regulatory agency.

o. *Best Interests of Creditors (Section 1129(a)(7) of the Bankruptcy Code)*: The Debtors have put forth affirmative evidence showing that general unsecured creditors will fare better under the Plan than in a chapter 7 liquidation. The Liquidation Analysis demonstrates that Holders of General Unsecured Claims (Class 4) are projected to receive under the Plan more than the estimated distribution they would expect to receive in a hypothetical chapter 7 liquidation. The Debtors have also filed concurrently herewith, the Confirmation Declaration, which reaffirms both the liquidation and disposable income analysis in the Plan.

p. *Acceptance of the Plan (Section 1129(a)(8) of the Bankruptcy Code)*: Each class of impaired claims voted to accept the Plan.

q. *Treatment of Administrative and Tax Claims (Section 1129(a)(9) of the Bankruptcy Code)*: The Plan provides for payment of professional fees of the Debtors' professionals and the Subchapter V trustee—the only known administrative expense claimants—in full in cash after allowance of their fee application. The Debtors have been paying tax obligations in the ordinary course and have agreed to pay any taxes due prior to the Effective Date on or before the

    Effective Date. Allowed priority wage claims will be paid in full on the Effective Date, or at the time such claims become Allowed Claims.

r.  *Acceptance by at Least One Impaired Class (Section 1129(a)(10) of the Bankruptcy Code)*: Classes 1(k) and 1(m) are impaired classes that voted to accept the Plan. Both Classes 1(k) and 1(m) consist entirely of non-insiders of the Debtors.

s.  *Feasibility (Section 1129(a)(11) of the Bankruptcy Code)*: The Plan includes a five-year financial projection attached thereto as Exhibit C, which demonstrates the Debtors' ability to make all of the payments due on the Effective Date and thereafter. The Plan will be funded with funds that are not for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors, or in the event of a sale transaction, from the proceeds of the sale transaction. The Debtors' financial projections show that the Debtors will have a cash flow after paying operating expenses and post-confirmation taxes to meet their obligations under the Plan. All Disposable Income is devoted to paying Allowed Claims under the Plan. The Debtors' financial projections reflect that the Debtors are capable of funding the Disposable Income Fund—the source of payments for unsecured creditors over the life of the Plan. Payments from the Disposable Income Fund to General Unsecured Creditors will commence by February 14, 2026, or earlier in the event of a sale transaction. With respect to the DIP Lender's Secured Claim, the DIP Loan will be retired by the Exit Facility. The projections demonstrate the Debtors' ability to repay the Exit Facility. All other unimpaired secured claims will be paid in the ordinary course of business. Additionally, the Debtors will have sufficient cash on hand on the Effective Date to pay all of the Claims and expenses that are entitled to be paid on that date. Finally, the Debtors will be able to satisfy Allowed General Unsecured Claims, as set forth in the Plan, until the Last Distribution Date, with such payments currently expected to last for about five years. Therefore, Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors.

t.  *Payment of Fees (Section 1129(a)(12) of the Bankruptcy Code)*: I understand this provision is inapplicable to the Debtors because no fees under 28 U.S.C. § 1930 are required to be paid by the Debtors, given their election to proceed under Subchapter V of chapter 11.

u.  *Retiree Benefits (Section 1129(a)(13) of the Bankruptcy Code)*: The Debtors do not have any present obligations to pay retiree benefits within the meaning of section 1129(a)(13), as I understand it.

v.  *Domestic Support Obligations (Section 1129(a)(13) of the Bankruptcy Code)*: The Debtors are limited liability companies and professional limited liability companies. None of the Debtors are required by any judicial or administrative order to pay domestic support obligations.

w. *Individual Debtor Requirements (Section 1129(a)(15) of the Bankruptcy Code)*: I understand Section 1129(a)(15) of the Bankruptcy Code is inapplicable to the Debtors , given their election to proceed under Subchapter V of chapter 11.

x. *Only One Plan (Section 1129(a)(15) of the Bankruptcy Code)*: The Plan calls for no transfers governed by non-bankruptcy law relating to transfer of property by a corporation or trust that is non a moneyed, business, or commercial corporation or trust. Thus, I understand this provision is not applicable to the Debtors.

## **CONCLUSION**

30.      Based on the foregoing, I believe that the Plan satisfies the requirements of the Bankruptcy Code and the Bankruptcy Rules and should be confirmed.

Pursuant to 28 U.S.C. § 1756, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 22, 2024

                                                *DocuSigned by: Colin Chenault, C724E52CEC1F49C...*

                                            Colin Chenault
                                            DOC Corporate Group LLC
                                            Chief Financial Officer