**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Case No. 24-10279 (JKS) |
| | Chapter 11 (Subchapter V) |
| PIONEER HEALTH SYSTEMS LLC, *et al.*,[1] | |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. 243 |

**DEBTORS' OPPOSITION TO MEDPORT
BILLING, LLC AND MSC HOLDING, LLC D/B/A
SYNDEOCARE'S MOTION TO REMOVE DEBTOR AS
DEBTOR IN POSSESSION AND TO APPOINT SUBCHAPTER V
TRUSTEE AS OPERATING TRUSTEE PURSUANT TO 11 U.S.C. § 1185(a)**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
hereby object (the "Opposition") to *Medport Billing, LLC and MSC Holding, LLC d/b/a
Syndeocare's Motion to Remove Debtor as Debtor in Possession and to Appoint Subchapter V
Trustee as Operating Trustee Pursuant to 11 U.S.C. § 1185(a)* [Docket No. 242] (the "Motion").
In support of the Opposition, the Debtors incorporate the *Declaration of Colin Chenault in Support
of Debtors' Opposition to Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare's
Motion to Remove Debtor as Debtor in Possession and to Appoint Subchapter V Trustee as
Operating Trustee Pursuant to 11 U.S.C. § 1185(a)* ("Chenault Declaration") and the *Declaration
of Alessandra Glorioso in Support of Debtors' Opposition to Medport Billing, LLC and MSC
Holding, LLC d/b/a Syndeocare's Motion to Remove Debtor as Debtor in Possession and to*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows: Pioneer Health Systems LLC (4107), DOC LLC (0729), DOCTX3 PLLC (2604), PAS Services PLLC (8928), and DOC Corporate Group LLC (0970). The address of the Debtors' corporate headquarters is 3300 Dallas Pkwy, Suite 200, Plano, TX 75093.

*Appoint Subchapter V Trustee as Operating Trustee Pursuant to 11 U.S.C. § 1185(a)* ("Glorioso

Declaration"), to be filed concurrently with this Opposition. The Debtors respectfully represent:

## PRELIMINARY STATEMENT

1.      The Debtors entered these chapter 11 cases with the goal of efficiently reorganizing.

The Debtors have worked diligently since the inception of these cases to secure DIP financing,

strategically assume and reject certain unexpired leases and executory contracts to reduce the

Debtors' debt load and optimize market share, complied with their required filings and reporting

obligations, and—in consultation with various parties, including the Subchapter V Trustee—to

craft a plan of reorganization that maximizes value to creditors and provides a finely-negotiated

balance of interests for the classes of creditors.  As detailed in the *Brief in Support of Confirmation

of Debtors' Second Amended Subchapter V Plan of Reorganization* [Docket No. 255] (the

"Confirmation Brief"), the Debtors have obtained the creditor approval necessary to proceed with

a consensual confirmation of their plan.

2.      Notwithstanding the Debtors' progress, at the eleventh hour, litigation claimants

Medport Billing, LLC ("Medport") and MSC Holding, LLC d/b/a Syndeocare ("MSC" and with

Medport, the "Movants") seek to upset the Debtors' achievement of their goals in these cases and

the benefits the Plan provides to all creditors.  Seeking to recover ahead of other unsecured

creditors, the Movants rely on arguments of alleged self-dealing and mismanagement echoing the

allegations in the state court litigation underlying their litigation claims, to advance an argument

that the Debtors should be removed as debtors in possession pursuant to section 1185(a) and the

Subchapter V Trustee appointed as an operating trustee under section 1183(b)(5) of the Bankruptcy

Code.

3.      The Movants fail to satisfy the heightened burden for the relief they seek. Indeed, some of their contentions are simply untrue, such as their assertion that the Debtors have done nothing to entertain the sale offers received during the bankruptcy cases. They disregard the Bankruptcy Code's exception to the absolute priority rule for Subchapter V cases when they accuse the Debtors of rewarding their equity holders to the detriment of unsecured creditors by having them retain their equity as the Bankruptcy Code permits. They ignore the fact that the Debtors are entitled to their business judgment and the significant considerations the Debtors undertook to balance the limited liquidity the Debtors face for the remainder of their Bankruptcy Cases and the upside that a more fulsome marketing process plus the planned disposable income distributions may yield.

4.      Moreover, nothing asserted in this Motion rises to the level of the egregious conduct evidenced in prior court decisions that found for the removal of Subchapter V debtors in possession.  Rather, case law supports denial of the Motion.

5.      Consequently, for the reasons stated herein, the Court should deny the Motion in its entirety.

## RELEVANT BACKGROUND

### I.      Procedural History

6.      On the Petition Date, each Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code as a debtor defined in Bankruptcy Code section 1182(1) and each Debtor elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Reorganization Act of 2019 (Public Law 116-54), as amended (the "Bankruptcy Cases"). A discussion of the Debtors' history, a description of their business, assets and liabilities, and the events that led to the need for bankruptcy relief is set forth in the *Declaration of Colin Chenault*

3

*in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 17] (the "First Day Declaration") and incorporated herein by reference.

7.      The Debtors sought to obtain breathing space from their creditors and various pending lawsuits, focus on rejecting unprofitable leases for closed or never-opened locations, reduce debt burden, and place more emphasis on profitability and positive cash flow. First Day Decl., ¶ 22.

8.      On February 22, 2024, Mr. David M. Klauder was appointed as the Subchapter V Trustee (the "Subchapter V Trustee"). No other trustee, examiner, or official committee has been appointed in these cases. The Debtors are operating their business as debtors in possession pursuant to section 1182(2) of the Bankruptcy Code.

9.      The Debtors experienced initial difficulty in obtaining DIP financing.  Dr. Hassinger stepped in to provide the necessary funds to administer the Bankruptcy Cases. *See* Final DIP Order[2] [Docket No. 100]. In recognition of the reality that Mr. Hassinger's position as DIP lender could give rise to conflicts in decision making regarding the bankruptcy cases, the Debtors authorized the Debtors' Chief Financial Officer, Colin Chenault to make decisions in connection with the bankruptcy cases.  Chenault Decl. ¶ 17. The board resolutions for each debtor, filed with the voluntary petitions, designate Mr. Chenault as the person responsible for bankruptcy decisions. *Id*.

10.      Shortly after the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Authorizing Use of Cash*

---

[2] As defined in paragraph 10 of this Opposition.

4865-5910-5234\2

*Collateral; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "<u>DIP Motion</u>") [Docket No. 18] to provide necessary short-term liquidity for the Debtors' operations. The Court entered an order approving the relief requested in the DIP Motion on March 28, 2024 (the "<u>Final DIP Order</u>") [Docket No. 100].

11.     On May 21, 2024, the Debtors proposed their *Subchapter V Plan of Reorganization* (as it may be amended or supplemented, the "<u>First Plan</u>") [Docket No. 181] which they amended on May 31, 2024, to address various comments they received. The Debtors *Amended Subchapter V Plan of Reorganization* (the "<u>First Amended Plan</u>") [Docket No. 185] was distributed to creditors for solicitation.

12.     After filing of the First Plan, the Debtors received expressions of interest in purchasing the Debtors or their assets from two parties, including North Pointe Ventures, LLC. Colin Decl. ¶ 10. Given the expressions of interests, the Debtors began working on a marketing process to market test the value of their business, but keeping in mind the Debtors' need to emerge with a confirmed plan by August 2024 to be able to access exit financing for the additional liquidity needed for their operations to continue. Colin Decl. ¶ 12.

13.     On June 28, 2024, the Movants incorporate their *Objection to Amended Subchapter V Plan of Reorganization* (the "<u>Movants' Objection</u>") [Docket No. 218]. The Movants' incorporate by reference the arguments made in the Movants' Objection in the Motion. To the extent any of their arguments in their Movants' Objection are raised in their Motion, the Debtors similarly incorporate their responses to the Movants' Objection contained in the Confirmation Brief and supporting pleadings and exhibits filed therewith. To the extent such responses need to be addressed in this Opposition, the Debtors will reference their arguments contained in the Confirmation Brief as if such arguments were laid out in full herein.

14.     Ultimately, after consultation with the U.S. Trustee and the Subchapter V Trustee, the Debtors filed their *Second Amended Subchapter V Plan of Reorganization* (the "Second Amended Plan") [Docket No. 230] on July 5, 2024. The Second Amended Plan included a new Exhibit I, setting forth proposed sale procedures (the "Sale Procedures") (first disclosed in the *Plan Supplement* [Docket No. 215]) for a post-confirmation sale process (the "Sale Process"). The Sale Procedures established a fair and robust marketing process designed to maximize the possible return for stakeholders as opposed to the offers the Debtors had received that had not been market tested.

15.     Concurrently with filing of the Second Amended Plan, the Debtors agreed to requests by the U.S. Trustee and the Subchapter V Trustee to provide creditors who voted on the plan an opportunity to change their votes on confirmation, and to allow all creditors to object to the revisions made by the Second Amended Plan. Glorioso Decl. ¶ 5.

16.     On July 16, 2024, the Movants filed the Motion.

17.     Concurrently with the Motion, Movants filed *Medport Billing, LLC and MSC Holding, LLC d/b/a Syndeocare's Motion for Order Shortening the Notice Period for Consideration of the Motion to Remove Debtor as Debtor in Possession and to Appoint Subchapter V Trustee as Operating Trustee Pursuant to 11 U.S.C. § 1185(a)* [Docket No. 243] ("Motion to Shorten Time").

18.     Following a hearing held on July 18, 2024, the Court entered an order [Docket No. 249] granting the Motion to Shorten Time.

19.     On July 19, 2019, Andrew R. Vara, the United States Trustee for Regions 3 and 9 (the "U.S. Trustee") filed a limited objection to the Motion [Docket No. 252] (the "UST Limited

Objection") confirming that Bankruptcy Code does not permit the Subchapter V Trustee to file a plan of reorganization.

## II.    The Debtors' Businesses

20.    The Debtors operate and manage full-service orthopedic clinics in Texas and, prior to the petition date, also operated in Oklahoma and California. Colin Decl. ¶  Many of the Debtors' equity holders are also employees of the Debtors whose work will yield the disposable income that will fund distributions under the Debtors' *Second Amended Subchapter V Plan of Reorganization* [Docket No 230] (as may be further modified, amended or supplemented from time to time, the "Plan"). Chenault Decl. ¶ 5.

### A.    History with the Movants

21.    The Debtors and Movants are parties to prepetition state court litigation in Nevada (the "State Court Litigation") relating to payments stemming from a series of account receivables factoring agreements. *See* PAS Stmt. of Fin. Affairs, Part 3 [Docket No. 103].  The Movants reference the Movants' Objection with respect to their contention of the Debtors' "mismanagement" through the conduct of the Debtors' Chief Executive Officer, Dr. David Hassinger, accusing him of nonpayment and of his "misappropriation" of certain receivables PAS sold to the Movants without providing any further support or details in their Motion beyond their bald assertions aligning with Movants' disputed State Court Litigation claims. Colin Decl. ¶ 15. Those allegations relate only to dealings between MSC and PAS and are disputed by PAS. *See* PAS Svcs. PLLC Sched. E/F at 1 [Docket No. 107]; *see also* Pioneer Health Systems LLC Amended Sched. E/F at 6 [Docket No. 165]; DOC LLC Amended Sched. E/F at 15 [Docket No. 167].

22.    The Debtors take the position that there was no misappropriation.  The Debtors and the Movants disagree about amounts owed by MSC to PAS and the Debtors were entitled to an

offset. Chenault Decl. ¶ 16. Litigating the validity and amount of Movants' claims in the context of this Motion or confirmation of the Plan is not appropriate. The Debtors will review claims, including Movants' claims, in due course and file all appropriate objections to claims.  Suffice it to say that the Debtors' dispute Movants' self-serving statements and descriptions of the prepetition transactions between Movants and Debtors.

**B.    The Sale Offers**

23.    After the filings of the First Plan [Docket No. 181] and the Amended Plan [Docket No. 185], the Debtors received two unsolicited offers to purchase the Debtors or their assets from two parties. Glorioso Decl. ¶ 3. The first offer by North Pointe Ventures, LLC ("North Pointe") proposes to purchase the Debtors' equity and is valued at $12.235 million, with an estimated $10.5 million to be distributed to general unsecured creditors (the "First Offer").  *See* Plan § 2.5. The second offer the Debtors received proposed a combination of cash and 40% of the acquiring company's equity, which the Debtors valued at an estimated $30 million (the "Second Offer"). *See Id*. After closely reviewing both offers, the Debtors reached out to North Pointe to disclose the high-level terms of the Second Offer. Glorioso Decl. ¶ 4. North Pointe has not materially modified its First Offer, insisting that the Debtors take its offer or run a pre-confirmation sale process that the Debtors did not budget for and are unable to afford due to their limited liquidity. *Id*. The Debtors explained that they needed further financing to run such a sale process, but North Pointe and other parties have not offered to finance a pre-confirmation process. *Id*.  None of the interested parties have yet demonstrated proof of funds to close their proposed transactions. Chenault Decl. ¶ 11.

24.    Given the unsolicited offers, the Debtors began working on the Sale Procedures in consultation with the Subchapter V Trustee and the Office of the United States Trustee to market test the value of their business, while being mindful of the Debtors' need to emerge with a

confirmed plan by August 2024 to be able to access exit financing for the additional liquidity needed for their operations to continue. Chenault Decl ¶. The Sale Procedures are filed as Exhibit I to the Plan. *See* Plan, Ex. I.

25.     The Debtors have also recently received an expression of interest to purchase the Debtors' assets from another party, furthering the need for a robust marketing process and market test. Chenault Decl. ¶ 13.  Such party has expressed its unwillingness to participate in a 363 sale process. *Id*.

26.     Cognizant of their cash needs throughout the Bankruptcy Cases, the Debtors have timed confirmation of the Plan to permit them to access additional working capital through exit financing, which the Debtors have secured. *See Amendment to Plan Supplement*; Exs. 1-4 [Docket No. 260] Currently, the Debtors project the need to draw on exit financing as early as August 12, 2024. Chenault Decl. ¶ 14. The DIP budget [Docket No. 100-2] was never designed to accommodate a 363-sale process. *Id*. Rather, the 13-week budget supported the Debtors' goal from day one to shed unprofitable leases, streamline payments to creditors, and reorganize with a focus on profitability. First Day Decl. ¶ 22. The Plan is consistent with the course the Debtors set out for these Bankruptcy Cases, but reflects the developments that occurred after the filing of the First Plan. What did not change is the Debtors' need for additional liquidity.

27.     North Pointe filed its joinder to the Opposition (the "Joinder") [Docket No. 268] on July 23, 2024. Due to timing constraints, the Debtors incorporate their arguments in their Confirmation Brief as it relates to North Pointe and the *Declaration of Alessandra Glorioso in Support of Brief of the Debtors in Support of Confirmation of Debtors' Second Amended Subchapter V Plan of Reorganization* and its supporting exhibits [Docket No. 257] in opposition of the Joinder.

4865-5910-5234\2

## ARGUMENT

### I.    The Movants Must Show Cause for Removal by Clear and Convincing Evidence

28.    The party seeking appointment of a trustee "must prove the need for the appointment by clear and convincing evidence and that there is a strong presumption against appointing a trustee." *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 316 (3d Cir. 2004) (pertaining to section 1104). Because removal of a debtor in possession is "an extraordinary remedy, the movant's burden is high. There is a strong presumption in favor of allowing a chapter 11 debtor-in-possession to remain in possession." *In re Neosho Concrete Prods. Co.*, 2021 Bankr. LEXIS 1198, at *23 (internal citations omitted).

29.    Here, the Movants simply have not overcome the presumption or met their burden. Their Motion is woefully deficient, relies on disputed arguments from prepetition litigation, and is full of unsupported conclusions. The Movants failed to attach any declarations or exhibits to support their statements and mostly point to the Debtors' Plan, a consensual plan of reorganization that is supported by most creditors and formulated in consultation with the Subchapter V Trustee and other parties. Their arguments simply cannot stand.

### II.    Cause Does Not Exist to Remove Debtors as Debtors in Possession and Appoint an Operating Trustee.

30.    A Subchapter V debtor in possession may be removed for "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor, either before or after the commencement of the case" 11 U.S.C. § 1185(a).  The grounds for removal of a Subchapter V debtor in possession are essentially the same as the grounds for removing a Chapter 12 debtor in possession, and cause under Bankruptcy Code section 1185 closely aligns with grounds under section 1104 for removal of a traditional small business debtor. 8 *Collier on*

*Bankruptcy* P 1185.01 (16th 2024).  "Consequently, the focus of a court's determination of cause under section 1185(a) is on improper conduct of the debtor in possession and does not include the interests of creditors, equity security holders or other interests of the estate." *Id.*

31.    Consistent with the high showing required to remove a debtor in possession, Courts applying section 1185 require egregious conduct to order removal of a Subchapter V debtor in possession. *See, e.g.*, *In re Comedymx, LLC*, 647 B.R. 457, 465 (Bankr. D. Del. 2022) (removing the debtor from possession given its "threats to destroy the debtors' business for the purpose of harming its creditors"); *In re Pittner*, 638 B.R. 255, 260 (Bankr. D. Mass. 2022) (debtor, in his fifth bankruptcy case in ten years, was removed as debtor-in-possession after admitting that he deliberately refused to obey an order of the court to hire a broker and sell property); *In re Peak Serum, Inc.*, 623 B.R. 609, 632 (Bankr. D. Colo. 2020) (cause exists for removal due to a multitude of factors including dishonest actions in forming the Debtor, mislabeling bovine serum and not taking steps to remediate the mislabeling, filing perpetually inaccurate and untimely monthly operating reports, and acrimony between the Debtor and its largest creditor).

32.    The Motion here does not allege the sort of egregious conduct that justifies removing a debtor in possession.  Unlike the debtor in *Comedymx*, management here have not threatened to destroy the Debtors. *Comedymx, LLC*, 647 B.R. at 465.  Rather, the Debtors proposed a Sale Process that protects value by making sure the Debtors continuing operating as going concerns by accessing needed exit financing—financing they always expected they would need— while running a fair and robust marketing process to maximize value.

33.    Similarly, unlike the debtor in *Pittner*, the Debtors here are not serial filers merely trying to use the automatic stay as a free injunction while disobeying a court order. *Pittner*, 638 B.R. at 260.  Instead, the Debtors have consistently and clearly articulated their strategy to use the

tools Congress provided in the Bankruptcy Code to adjust their debts, right-size their operations, and emerge from these proceedings as healthier companies and on a relatively swift timeline.

34.     Nor are the circumstances of *Peak Serum* comparable to these Bankruptcy Cases. There are no allegations of irregularities with the Debtors' formation or accusations of mismanagement of Debtors' provision of medical services to patients. The Debtors have timely met their reporting and filing obligations in these Bankruptcy Cases.  And the acrimony from the Movants seems to be directed at the DIP Lender rather than those charged with responsibilities for these Bankruptcy Cases.

A.      **The Equity Holders' Retention of their Interests is Authorized by the Bankruptcy Code and Cannot be Grounds for Removing Management**

35.     The Movants allege that the Plan's proposal to retain equity for the equity holders without paying the junior creditor classes in full constitutes self-dealing. Congress disagrees. Under the governing rules governing a Subchapter V proceeding, to confirm a nonconsensual plan the bankruptcy court need only find that (i) such a plan provides all the debtor's projected disposable income to pay creditor claims for a three- to five-year period and (ii) that the plan is feasible. 11 U.S.C. § 1191(c)(2)(A) and (3). Thus, the owners of a Subchapter V debtor are permitted to retain their equity in a reorganized debtor despite creditors' objections and despite creditors not being paid in full. *Cantwell-Cleary Co. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC)*, 36 F.4th 509, 514 (4th Cir. 2022).  Indeed, section 1191 allows for a consensual plan to cram down unsecured creditors "even if stockholders, who are junior to unsecured creditors, retain their equity under the plan." *In re Chip's Southington, LLC*, No. 20-21458 (JJT), 2021 Bankr. LEXIS 3133, at *14 n.5 (Bankr. D. Conn. Nov. 13, 2021).

36.     Here, the Debtors are simply availing themselves of one of the benefits that Subchapter V offers.  It does not give rise to cause to remove Debtors as debtors in possession. If

12

Movants are unhappy about this policy choice, their remedy is with Congress, not multiplying litigation and wasting the Debtors resources on a motion to remove the Debtors as debtors in possession.

37.     Furthermore, the medical services industry has a common structure where the equity and note holders are also the medical professionals and/or employees providing valuable services. Because many of the equity holders are also the Debtors' employees, the Debtors are further incentivized to retain equity in the equity holders. As the Plan is a reorganization plan where the Debtors continue to operate, the Debtors in its business judgment, in consultation with the Subchapter V Trustee, created a Plan that would provide the reorganized Debtors with stability to operate by having such equity holders who have knowledge of the Debtors' operations and the industry stay. In any event, objections about the treatment of classes under the Plan is appropriate in relation to plan confirmation.   The Movants have not presented any precedent where the Debtors' treatment of their classes in accordance with the Bankruptcy Code is sufficiently egregious to warrant such an extreme remedy.

**B.      Sound Business Reasons Justify Debtors' Decision to Proceed with A Post-Effective Date Sale Process**

38.     Movants also allege that the Debtors are "shirking" their fiduciary duties by not going forward with one of the two sale offers that may maximize value to creditors because the Debtors' management is self-interested. Simply labeling the Debtors' business judgment as "self-interested" or in breach of a fiduciary duty does not make it so or necessitate the debtors in possession's removal.

39.     The Debtors are allowed to evaluate sale offers based on the debtors' business judgment as to what is the approach that would maximize value to creditors. Section 363 of the Bankruptcy Code provides that a trustee or debtor in possession *may* sell property of the estate

other than in the ordinary course of business, after notice and a hearing. 11 U.S.C. § 363. Thus, the Bankruptcy Code permits but does not require sales of property, and it is not a given that a debtor will obtain authorization to conduct a 363 sale. Bankruptcy courts impose certain requirements to prevent section 363 sales from "circumventing the protections afforded creditors under Chapter 11." *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

40.     In determining whether a sale is in the best interest of the estate, "the bankruptcy court reviews the trustee's (or debtor in possession's) business judgment to determine independently whether the judgment is a reasonable one. The court should determine only whether the trustee's (or the debtor's) judgment was reasonable and whether a sound business justification exists supporting the sale and its terms." *3 Collier on Bankruptcy § 363.02* (Alan N. Resnick & Henry J. Sommer, eds.,16th ed. 2024).

41.      Bankruptcy courts apply the "sound business purpose" test, which calls for consideration of a variety of factors and evaluates business judgment relating to a proposed transaction. *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Hldg. Corp. (In re Montgomery Ward Hldg. Corp.)*, 242 B.R. 147, 153 (D. Del. 1999).

42.     Being cognizant of the Debtors' duties of care and loyalty, the Debtors cannot in good faith propose a 363 or a pre-confirmation sale process. The Debtors' DIP budget [Docket No. 100-2] does not accommodate a 363 sale process. The 13-week budget supported the Debtors' goal from the first days of these cases: to shed unprofitable leases, streamline payments to creditors, and reorganize with a focus on profitability. First Day Decl. ¶ 22. The Plan is consistent with the course the Debtors set out for these cases. When the Debtors received expressions of interest, they pivoted and established the Sale Process that worked within the confines the Debtors' circumstances.

43.     Relatedly, the Debtors' inability to fund a 363 process means they are not able to market a 363 sale in a manner that obtains the highest and best value for stakeholders. The Debtors believe changes implemented during these Bankruptcy Cases, namely shedding unprofitable leases and improving operations at remaining locations will continue to increase their value post-confirmation. Chenault Decl. ¶ 18. Contrary to the Movants' assertions that the Debtors have not taken any steps to pursue these offers, the Debtors invited North Pointe to match the Second Offer, sought a demonstration of proof of funds to close the proposed sale transactions, and discussed the need for additional financing to run a sale process. Glorioso Decl. ¶ 4. The Debtors are happy to engage further with such parties—and an additional expression of interest was recently received [Chenault Decl. ¶ 13]—but the Debtors consider it more consistent with their fiduciary duties to run a marketing process that offers creditors upside while preserving the Debtors as going concerns, as proposed in the Plan, rather than propose a private sale in the Plan without the benefit of a competitive market test, as the Movants propose here.

44.     Conducting a 363 sale process without sufficient funds may result in a hasty private sale that does not maximize value for creditors, a loss of the Debtors' disposable income distributions over five years, and a greater risk for conversion or liquidation.  Assuming that the winning bidder is equivalent to the First Offer in the proposed Sale Process, the general unsecured creditors would receive $10.5 million. The Plan would yield an upside and the Debtors would be able to be more strategic about increasing the value of their businesses through more flexibility in timing and a fulsome marketing.

45.     It is because the Debtors are mindful of their fiduciary duties that, in their reasonable business judgment, they have decided to go forward with a viable, consensual Plan poised for confirmation that provides a potentially greater upside in the long run and the ability to

obtain proper financing for a robust marketing process. As such, the Debtors' business judgment and cooperative conduct does not constitute any disregard for their fiduciary duties. It is clear that the Movants have not satisfied their burden to show cause that the Debtors must be removed as debtors in possession.

46.     The Movants further contend that having the Debtors' management present a Plan that allows them and other owners to retain equity interests without opting to sell the Debtors' assets presents a conflict of interest in the Bankruptcy Cases.  Movants have failed to cite to any court decision or evidence that supports this contention. As the Debtors previously stated, the Bankruptcy Code clearly excludes the absolute priority rule from a plans under Subchapter V.  *See* 11 U.S.C. § 1191. Moreover, the Movants have not sufficiently met their burden in proving that not going forward with one of the two offers necessarily benefits the equity holders to the detriment of other creditors when the Debtors have exercised their business judgment given their liquidity constraints and the strong support for the Debtors' consensual Plan.

### C.     There has not been Mismanagement of the Debtors

47.     Relatedly, the Movants contend that the Debtors' were mismanaged prior to the Petition Date through the conduct of Dr. Hassinger, one of the Debtors' equity interest holders. The Movants accuse Dr. Hassinger of alleged nonpayment of their claims and of his alleged "misappropriation" of certain receivables PAS sold to the Movants.  The Movants utterly fail to provide any further support or details in their Motion beyond two sentences. Mot. ¶ 10. Such arguments are in line with the Movants' arguments made in the State Court Litigation, which the Debtors firmly disputes. Those allegations relate only to dealings between MSC and PAS and are disputed by PAS. *See* PAS Svcs. PLLC Sched. E/F at 1 [Docket No. 107]; *see also* Pioneer Health Systems LLC Amended Sched. E/F at 6 [Docket No. 165]; DOC LLC Amended Sched. E/F at 15 [Docket No. 167].  The Debtors take the position that there was no misappropriation.  A dispute

exists between the Debtors and the Movants about the amounts owed and the Debtors' offset against any claim held by Movants. Chenault Decl. ¶ 16.

48.     Other than these disputed allegations relating to the Movants' claims and their unhappiness the Debtors' reasonable business judgment in response to the sale offers, the Movants cite no other instances of any alleged "mismanagement" by the Debtors. The Court should not allow two disgruntled litigants to hold a viable, consensual Plan hostage.

### D.     Movants Offer No Evidence of Self-Dealing by Dr. Hassinger

49.     Here, there is no indication that Dr. Hassinger's conduct resembles self-dealing. When the Debtors experienced difficulty in obtaining DIP financing, Dr. Hassinger stepped in to provide the necessary funds to administer the Bankruptcy Cases. *See* Final DIP Order [Docket No. 100]. To avoid any conflicts in decision making regarding the Bankruptcy Cases, the Debtors authorized through board resolutions the Debtors' Chief Financial Officer, Colin Chenault, to make decisions in connection with the Bankruptcy Cases.

50.     Dr. Hassinger's actions have been more beneficial than harmful. Courts have denied removal of a debtor in possession when the prior self-dealing actions of the debtor's management has been ameliorated or mitigated to ensure the Debtors fulfill their fiduciary duties. See *In re Neosho Concrete Prods. Co.*, No. 20-30314, 2021 Bankr. LEXIS 1198, at *24 (Bankr. W.D. Mo. May 6, 2021) ("Though circumstances might have appeared to favor removal at the time the UST filed its motion, circumstances have since changed"). Thus, even if Dr. Hassinger's actions prepetition may weigh for removal, his post-petition actions and the current circumstances have eliminated any cause for removal.

51.     The Movants cite *In re ComedyMX, LLC*, a Delaware case, for the proposition that courts should not confirm a plan because there are "no better options" at this point. *See* Mot. ¶ 28. However, *ComedyMX* does not include such a statement, nor does it even address it. Instead, the

court in *ComedyMX* makes clear that "subchapter V redefines 'fair and equitable' such that a plan may be confirmed so long as it commits the debtor's projected disposable income over the applicable plan period (three or five years) to repay creditors. *In re ComedyMX, LLC*, 647 B.R. at 462. The decision makes clear that the "requirement that a plan satisfy absolute priority . . . does not apply under subchapter V." *Id*. The court further confirms that the Subchapter V trustee's expanded duties "do not include the authority to file a plan, which authority is given only to the debtor." *Id*. at 465. The court then recognized that in removing the debtors in possession, the debtors "either will or will not be able to [file a plan]." *Id*. The court ultimately held that cause existed to remove the debtors in possession mainly due to the fact that the 100 percent owner and sole officer of the debtors expressed open disdain of the law and his defiance of another court's injunctions. *Id*.  Those facts do not exist here.

52.    *ComedyMX* supports the Debtors' proposition that (i) its Plan structure of retaining equity for the equity holders accords with the Bankruptcy Code and (ii) a Subchapter V operating trustee's duties exclude the ability to file a plan (discussed, *infra*) and cannot "cause" the Debtors to file a plan, a decision is purely left to the Debtors.  Moreover, the facts of *ComedyMX* that supported a removal are easily distinguished from the Debtors in this instance because, the sole owner who controlled the *ComedyMX* debtors threated to "destroy[] the debtors' business for the purpose of harming its creditors." *Id*. Such an extreme circumstance and egregious behavior warranting removal of the debtors in possession is glaringly absent here, particularly when the Debtors proposed a Plan in accordance with the Bankruptcy Code, the Plan provides for the upside from a transaction be contributed to creditors, and all the voting classes have voted to accept the Plan, which is ripe for confirmation.

**E.      Removal is a Disproportionate Remedy for the Alleged Wrongs**

53.      Even in the unlikely event that the Court finds possible instances of self-dealing or doubts the Debtors' ability to uphold their fiduciary duties, removal of the Debtors under section 1185(a) is an excessive and disproportionate remedy. Numerous court decisions removing the debtors as debtors in possession or converting the case where a contemporaneous removal request existed have undergone evidentiary hearings or investigations by the Subchapter V trustee. *See, e.g. In re No Rust Rebar, Inc.*, 641 B.R. 412 (Bankr. S.D. Fla. 2022) (converting case after an evidentiary hearing and a court-ordered investigation and report from the Subchapter V trustee). In *In re Corinthian Commc'n, Inc.*, the U.S. Trustee sought removal of the debtor due to fraud, gross mismanagement, and a lack of transparency where the debtor committed fraud on its PPP loan applications, continually failed to provide disclosures, and the lacked corporate formalities with intercompany transactions. 642 B.R. 224, 234 (Bankr. S.D.N.Y. 2022). There, the court declined to remove the debtor and instead expanded the Subchapter V trustee's duties pursuant to section 1183(b)(2) to include investigation of the debtor and its operations, reserving removal of the debtor until after the outcome of the investigation. *Id*.

**F.      The Debtors Have Offered Evidence of Committed Exit Financing**

54.      The Movants also expressed concern regarding the lack of committed exit financing and the ability of the Debtors to engage an investment banker to assist in the Sale Process. The Debtors have secured exit financing as proposed in the Plan and described in the amendment to the Plan Supplement [Docket No. 260].  To the extent the Debtors do not retain an investment banker consistent with the Sale Procedures, parties have remedies to ensure the Debtors' good behavior, including a well-supported motion for removal of the Debtors post-confirmation for "failure to perform the obligations of the debtor under a plan confirmed under this subchapter [V]." 11 U.S.C. § 1185(a).

### III.    The Powers the Movants' Would Have the Court Invest in the Subchapter V Trustee Are Prohibited by the Bankruptcy Code.

55.    The ultimate relief the Movants seek is not authorized by the Bankruptcy Code. The Movants proposed that the Debtors be removed and the Subchapter V Trustee be appointed as operating trustee, and once in place the Subchapter V Trustee can "cause" the Debtor to file a Plan that provides for a pre-confirmation sale. The Movants' proposal attempts to circumvent sections 1189(a) and 1183(b)(5) of the Bankruptcy Code.

56.    Section 1189(a) makes clear that "[o]nly the debtor may file a plan." *See* 11 U.S.C. §§ 1189(a). In turn, section 1183(b)(5) explicitly excludes a trustee's authority to file a plan under section 1106(a)(5) for Subchapter V cases. *See* 11 U.S.C. § 1183(b)(5). Congress's intent under sections 1183(b)(5) and 1189(a) is clear, and the expansion of a Subchapter V trustee's duties due to the removal of a debtor as debtor in possession does not change the fact that Subchapter V trustees cannot file a plan, no matter what wording the Movants utilize. *See* Hon. Paul W. Bonapfel, A Guide to the Small Business Reorganizationf Act of 2019 at 86 (Rev. June 4, 2022) ("In a subchapter V case, however, § 1121 does not apply, §1181(a), and the debtor thus remains the only party who can file a plan under §1189(a)."). This is contrary to the Movants' unfounded conclusion that the outcome sought by the Movants is consistent with section 1189(a).

57.    The Movants attempt to obfuscate the clear language of the Bankruptcy Code to argue that a Subchapter V trustee's duty to operate a debtor's business before the confirmation of a plan pursuant to section 1183(a)(5)(B) combined with the trustee's duty to "facilitate the development of a consensual plan of reorganization" under section 1183(a)(7) permit the Subchapter V Trustee to essentially force the Debtors to file a plan that the Debtors oppose. This theory ignores Congress' intention when it excludes from the Subchapter V trustee's duties the authority to file a plan.

58.     The Movants offer no court decision suggesting that a Subchapter V trustee has the authority to propose a plan, even where the debtor has been removed as debtor in possession. The Subchapter V trustee's role to facilitate the development of a consensual plan of reorganization has been compared to a mediator's role. *See In re Louis*, No. 20-71283, 2022 Bankr. LEXIS 1586, at *50 (Bankr. C.D. Ill. June 7, 2022). Additionally, the definition of "facilitate" is to "make the occurrence of (something) easier; to render less difficult." *In re 218 Jackson LLC*, 631 B.R. 937, 947 (Bankr. M.D. Fla. 2021) (citing *Black's Law Dictionary* 734 (11th Ed. 2019)). In essence, the trustee's facilitation role is not an adversarial role to strong-arm the debtor to file a plan in accordance with the trustee's or a creditor's goals. Rather, the trustee's role is to help create a consensual plan under the requirements of section 1129(a). The Subchapter V Trustee simply cannot "cause" the Debtors to file a plan that the Debtors consider in its sound business judgment to not be in the best interest of the creditors, particularly when the Subchapter V Trustee has been actively participating throughout this case and in the creation of the Debtors' Plan. Simply put, what the Movants propose for the role of the Subchapter V Trustee as an operating trustee is explicitly excluded in Subchapter V cases by the Bankruptcy Code.

59.     The Debtors' position is supported by the UST Limited Objection expressing the same limitation of the Bankruptcy Code. Faced with the scenario that the Subchapter V Trustee as an operating trustee is unable to file a plan and has limited cash flow to effectuate a sale, the relief sought in the Motion would place the Debtors' estates in limbo and lead to a detrimental outcome for their creditors.

* * *

60.     The Debtors have complied with the requirements of the Bankruptcy Code, continually consulted with the Subchapter V Trustee, cooperated with the U.S. Trustee, and

evaluated and investigated the two sale offers. The Debtors have proposed a Plan that accords with the features of Subchapter V and provides for a Sale Process that includes a market test to maximize value to creditors.  Based on the foregoing, the Motion provides no support for the Movants' conclusions that the Debtors' management has not proposed a Plan in good faith and is mismanaging the Debtors. Consequently, the Movants have failed to meet the heightened burden to justify cause for the removal of the debtors in possession and the appointment of a Subchapter V trustee with expanded duties under section 1183(b)(5) of the Bankruptcy Code.

## **NOTICE**

61.    This Opposition will be served on the following parties, or their counsel if known: (a) the Office of the United States Trustee; (b) the Subchapter V Trustee; (c) all parties that requested notice pursuant to Bankruptcy Rule 2002; (d) the Movants; (e) the DIP Lender, and (f) each of the Debtors' creditors holding the twenty (20) largest unsecured claims as set forth in the list filed with the Debtors' petitions. The Debtors submit that such notice is adequate and no other notice need be given.

*[Remainder of the page is intentionally left blank]*

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court (i) deny the Movants'

Motion in its entirety and (ii) grant the Debtors such further relief as is just and proper.

Dated: July 23, 2024
Wilmington, Delaware

**DORSEY & WHITNEY (DELAWARE) LLP**

*/s/ Alessandra Glorioso*
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Email: glorioso.alessandra@dorsey.com

-and-

**DORSEY & WHITNEY LLP**
Matthew Olson (*pro hac vice*)
167 Hamilton Avenue, Suite 200
Palo Alto, CA 94301
Telephone: (650) 857-1717
Email: olson.matt@dorsey.com

*Counsel for the Debtors and Debtors in Possession*

4865-5910-5234\2